38 F.3d 1038
 66 Fair Empl.Prac.Cas. (BNA) 113,
65 Empl. Prac. Dec. P 43,409, 63 USLW 2320
 Sidney WEISSMAN, Appellant,
v.
CONGREGATION SHAARE EMETH; Joy Liss, in her capacity as
President, Congregation Shaare Emeth, Appellees.
Equal Employment Opportunity Commission, Amicus Curiae.
 No. 94-1464.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 12, 1994.
Decided Oct. 28, 1994.
 
 John D. Lynn, St. Louis, MO, argued, for appellant.
 Joseph H. Mueller, St. Louis, MO, argued (Robyn G. Fox, on the brief), for appellee.
 John F. Suhre, Washington, DC, argued, for amicus curiae.
 Before McMILLIAN, Circuit Judge, BRIGHT, Senior Circuit Judge, and LOKEN, Circuit Judge.
 McMILLIAN, Circuit Judge.
 
 
 1
 Sidney Weissman appeals from a final order entered in the United States District Court for the Eastern District of Missouri[1] granting partial summary judgment in favor of Congregation Shaare Emeth, and its president, holding that the Age Discrimination in Employment Act (ADEA) did not apply to pervasively religious institutions. Weissman v. Congregation Shaare Emeth, 823 F.Supp. 1483 (E.D.Mo.1993) (memorandum and order). For reversal, Weissman argues the district court erred in granting partial summary judgment because his claim of age discrimination can be adjudicated without creating a serious risk of excessive government entanglement with religion. For the reasons discussed below, we reverse the judgment of the district court and remand the case to the district court for further proceedings consistent with this opinion.
 
 I. BACKGROUND
 
 2
 Weissman was employed as the temple administrator for the Defendant Congregation Shaare Emeth ("Temple"), a Reform Jewish Temple, and was terminated in December 1990. At the time, Weissman was 63 years old. He was replaced by a 37-year-old person. Weissman was employed by the Temple from January 13, 1986, to December 21, 1990. The Temple is one of the largest in the country with approximately 2,000 families in the congregation. As temple administrator, Weissman was responsible for logistical support of activities including supervision of administrative, clerical, building maintenance, and custodial personnel. He also managed property and equipment and maintained financial records. He was not a member of the clergy and played no role in decisions relating to spiritual matters. As temple administrator, Weissman reported to Harvey Schneider, the president of the congregation. The job description also requires that the temple administrator have a positive attitude toward Jewish life and a Jewish background enabling the administrator to understand the work of the Temple, its purpose and highest ideals and goals. The temple administrator is to provide the initial point of contact with prospective members, and he is required to promote a positive image of the Temple among its members and to the general community by being accessible and knowledgeable.
 
 
 3
 The decision to terminate Weissman was made by the Temple's executive committee, which consisted entirely of lay persons. According to Harvey Schneider, the president of the congregation at the time of the termination, he told Weissman that "things were not working out." In his deposition, Schneider cited the following specific reasons for Weissman's termination: the failure to properly supervise custodial personnel, the purchase of a facsimile machine which was too expensive, the release of a membership list to a congregation member, the failure to resolve a dispute between the chief custodian and a secretary, and his lack of sufficient familiarity with the computer system. In response to Weissman's interrogatories, the Temple also cited a general dissatisfaction with Weissman's performance and his failure to remedy deficiencies after he had been advised of them. Weissman denied fault in any of these matters.
 
 
 4
 Weissman alleged he was terminated because of his age in violation of the ADEA. He also alleged sex discrimination in violation of Title VII, 42 U.S.C. Sec. 2000e. Defendants filed a motion for partial summary judgment on the age discrimination claim on the ground that the ADEA does not apply to religious institutions such as the Temple. Alternatively, defendants argued that even if the ADEA applied generally to religious institutions, it would violate the First Amendment to apply the ADEA to defendants on the facts of the present case. The district court held that because the application of the ADEA to the Temple presented a significant risk of infringement upon the First Amendment, the ADEA did not apply to such religious institutions and granted partial summary judgment in favor of defendants. Id. at 1486. Weissman filed a motion for reconsideration, citing the recent circuit opinions discussed below, which the district court denied. 839 F.Supp. 680 (1993). Weissman voluntarily dismissed the Title VII claim in order to bring this appeal. The Equal Employment Opportunity Commission (EEOC) filed a brief as amicus curiae in support of Weissman.
 
 II. DISCUSSION
 
 5
 We review a grant of summary judgment de novo. The question before the district court, and this court on appeal, is whether the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986); Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir.1992); St. Paul Fire & Marine Insurance Co. v. FDIC, 968 F.2d 695, 699 (8th Cir.1992).
 
 
 6
 In this appeal, Weissman's precise claim is that the district court erred in concluding that the Temple was not an "employer" as defined by 29 U.S.C. Sec. 630(b) for purposes of the Age Discrimination In Employment Act (ADEA).[2] Under a literal reading of the statutory definition, the Temple is an "employer" covered by the ADEA. However, the ADEA is silent on the question whether religious institutions are employers. Furthermore, the legislative history lacks any indication that religious institutions were not meant to be covered by the statute. The present controversy therefore arises because of the Constitution's special protection for religious freedom.
 
 
 7
 In its motion for partial summary judgment, the Temple argued that "[a]pplication of the ADEA to employment decisions regarding [the Temple] would raise serious constitutional issues." The Temple then drew an analogy between the present case and the Supreme Court's opinion in NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) (Catholic Bishop). In Catholic Bishop, the Court held that school teachers employed by parochial schools were not covered under the National Labor Relations Act (NLRA). In the present case, the district court applied the two-part Catholic Bishop prudential test. The district court framed the issue in the following manner: "The motion presents the legal question whether a religious institution such as [the Temple] is an 'employer' as that term is used in the ADEA." Weissman, 823 F.Supp. at 1484. The district court noted that a majority of the courts which had considered this question had held that the ADEA did not extend to religious institutions. Id. (citing cases). However, two of three cases that held the ADEA did not apply to religious institutions have since been reversed. See Geary v. Visitation of the Blessed Virgin Mary Parish School, 7 F.3d 324 (3d Cir.1993) (Geary); DeMarco v. Holy Cross High School, 4 F.3d 166 (2d Cir.1993) (DeMarco). A third case, Cochran v. St. Louis Preparatory Seminary, 717 F.Supp. 1413 (E.D.Mo.1989) (Cochran), was not appealed to this court. The district court was correct to apply the Catholic Bishop test to the question of the ADEA's scope, but in resolving the first part of that test, i.e. whether application of the ADEA in the present case would present a significant risk of infringement upon the First Amendment, the district court did not properly distinguish between the application of a comprehensive regulatory statute like the NLRA and the comparatively minimal intrusions of the ADEA. A careful examination of the ADEA's limited goals reveals the ADEA will rarely weave a web large enough to cause the significant risk of entanglement which the looming presence of the NLRA threatens.
 
 
 8
 A. The Catholic Bishop model for statutory construction.
 
 
 9
 In Catholic Bishop, the Court was faced with the question whether the National Labor Relations Board (NLRB) could exercise jurisdiction over teachers in church-operated schools. The Court began its analysis with the long-established principle that "an Act of Congress ought not be construed to violate the Constitution if any other possible construction remains available." 440 U.S. at 500, 99 S.Ct. at 1318. With this in mind, the Court narrowly focused on whether the exercise of the NLRB's jurisdiction "present[ed] a significant risk that the First Amendment will be infringed." Id. at 502, 99 S.Ct. at 1319. As it addressed this question, the Court importantly noted that resolution of unfair labor practice charges "in many instances would necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission." Id. The Court also worried about the introduction of mandatory collective bargaining over terms and conditions of employment and the potential for significant encroachment of the NLRB upon the school's former position of autonomous management. These factors led the Court to conclude that serious First Amendment questions would follow from application of the NLRA to teachers in church-operated schools.
 
 
 10
 The Court next considered whether the NLRA must be read to confer jurisdiction on the NLRB over church-operated schools. This is the second part of the Catholic Bishop test. If the Court had concluded that the NLRA must be read to confer jurisdiction over teachers in church-operated schools, it would have been forced to resolve the question whether the exercise of such jurisdiction violated the First Amendment. However, finding no clear expression of an affirmative intention of Congress that teachers in church-operated schools should be covered by the NLRA, the Court was able to construe the statute so as to avoid the constitutional question.
 
 
 11
 B. Application of the Catholic Bishop model to the ADEA.
 
 
 12
 In the present case, the crucial question is whether application of the ADEA to the relevant facts poses a "significant risk" of infringement upon the First Amendment. In a comparison of the deciding factors in Catholic Bishop and the particular facts of the present case, it is important to note the distinctions between the narrow inquiry required under the ADEA and the searching questions the NLRB is entitled to ask and resolve under the NLRA. The differences were thoroughly explored in Geary and DeMarco. In DeMarco, the Second Circuit considered whether the ADEA applied to an action brought by a lay mathematics teacher against his parochial school employer. The teacher had certain religious duties, including leading his students in prayers and taking them to Mass. The school moved for summary judgment arguing that the teacher had been dismissed for reasons unrelated to his age, including failure to perform the two religious duties mentioned above. The district court held that the ADEA should not be construed to apply to parochial schools, at least with respect to employees with some religious duties. On appeal, the Second Circuit employed the two-step Catholic Bishop prudential analysis. However, at the outset, the court noted the "important distinction between the ongoing government supervision of all aspects of employment required under labor statutes like the NLRA and the limited inquiry required in anti-discrimination disputes." DeMarco, 4 F.3d at 169. The court correctly pointed out that ADEA actions do not require extensive or continuous administrative or judicial intrusion into the function of religious institutions.[3] The DeMarco court draws this distinction into sharper focus by its discussion of the application of the burden-shifting scheme of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (McDonnell Douglas).[4] After an employer gives a reason other than the employee's age for his or her dismissal, the employee can then attempt to show that the stated reason is mere pretext. This limited review is much less threatening to the Religion Clauses of the First Amendment than the pervasive reach of the NLRB which concerned the Supreme Court in Catholic Bishop. The DeMarco court, however, cautioned that the employee's attack cannot go beyond the demonstration of pretext and question the validity of religious belief or the plausibility of the stated religious reason: "[I]n applying the McDonnell Douglas test to determine whether an employer's putative purpose is a pretext, a fact-finder need not and indeed should not evaluate whether a defendant's stated purpose is unwise or unreasonable." 4 F.3d at 170. Indeed, this court has stated that "[a]n employer's articulated reason for terminating a member of a protected class need not be a sound business reason, or even a fair one." Gray v. University of Arkansas, 883 F.2d 1394, 1401 (8th Cir.1989).
 
 
 13
 Geary was also an ADEA action where the religious employer claimed a religious reason for termination. In Geary, a parochial school said it had dismissed a lay teacher because she had married a divorced man, an action contrary to church doctrine. The Third Circuit applied the Catholic Bishop test, but, like the DeMarco court, it noted the difference between the comprehensive nature of the NLRA and the limited remedial purpose of the ADEA. The court found no constitutional problem with Geary's ADEA claim as long as she did not challenge the validity of the religious doctrine asserted as cause for her dismissal. 7 F.3d at 329. The court concluded that the mere inquiry into whether the putative religious reason was the real reason posed no significant threat of constitutional infringement: "A conclusion that the religious reason did not in fact motivate dismissal would not implicate entanglement since that conclusion implies nothing about the validity of the religious doctrine or practice...." Id. at 330. The Geary court's approach further distinguished the facts of Catholic Bishop from cases involving ADEA claims against religious employers.[5] In the present case, the district court failed to appreciate this factor when performing its Catholic Bishop analysis.
 
 
 14
 Under the ADEA, the factfinder does not ask if the employer's stated reasons are fair or reasonable, but asks if they are the actual reasons. By contrast, under the NLRA, the Supreme Court pointed out that when faced with an unfair labor practice charge, the NLRB would have to consider an employer's position, allegedly mandated by religious creed, in relationship to the employer's religious mission. Catholic Bishop, 440 U.S. at 502, 99 S.Ct. at 1319. If the contested practice were premised on a religious belief, the factfinder would have to evaluate the challenged practice in light of the employer's spiritual goals. Such inquiry is precluded by the Religion Clauses of the First Amendment.
 
 
 15
 The significant risk of infringement which is readily apparent in Catholic Bishop may or may not be present in an ADEA case, but because of the minimal intrusion of the ADEA and the limited scope of its inquiry, we hold that the Catholic Bishop test should be applied on a case-by-case basis to age discrimination cases involving lay employees of religious institutions.[6] We agree with the Second Circuit that cases in which clergy sue a religious employer are inapposite to lay employees of religious institutions because such cases deal "with the pervasively religious relationship between a member of the clergy and his [or her] religious employer." DeMarco, 4 F.3d at 171 (emphasis added); see Geary, 7 F.3d at 331. In the present case, the district court put too much emphasis on the character of the employer and not enough on the dynamics of the employment relationship.[7] We agree with the Second Circuit that there may be cases involving lay employees in which the relationship between the employee and the employer is so pervasively religious that it is impossible to engage in an age-discrimination inquiry without serious risk of offending the First Amendment. Id. at 172. The case-by-case approach, which we mentioned in Scharon v. St. Luke's Episcopal Presbyterian Hosp., 929 F.2d 360, 363 n. 3 (8th Cir.1991), is the appropriate method for determining those matters which threaten constitutional infringement.[8]
 
 
 16
 C. Application of the ADEA to Weissman's claim.
 
 
 17
 We hold Weissman's ADEA claim does not pose a significant risk of infringement upon the First Amendment. The requirements that Weissman have a positive attitude toward Judaism, a Jewish background, and knowledge about the Temple are the only duties which can even be said to have a religious component. The overwhelming majority of his responsibilities are wholly secular.[9] In DeMarco, the court allowed the ADEA action to proceed even though the lay teacher had some religious duties. The nature of a lay person's religious duties can be considered in a court's Catholic Bishop analysis, but the mere fact that a lay employee has religious duties does not shield a religious employer from an ADEA claim. Moreover, in the present case, the Temple failed to allege deficiencies in these arguably religious duties or to assert any other religious reasons for Weissman's termination. The belated assertion by the Temple that Weissman was also fired because of a general dissatisfaction with his performance cannot be deemed a religious reason. The Temple argues that such a general ground impliedly calls into question Weissman's ability to fulfill all of his job qualifications, including those relating to his knowledge of and attitude toward Judaism. This contention is unpersuasive. General dissatisfaction with performance can be a reason for termination, but without more, it cannot be characterized as a religious reason.
 
 
 18
 Where, as here, an employee is not a member of the clergy, the application of the ADEA to a religious employer is not, as a matter of law, sufficient to pose a significant risk of infringement upon the First Amendment where none of the reasons asserted for the adverse employment action rests on religious grounds. When analyzing an ADEA action under Catholic Bishop, a court cannot focus solely on the character of the religious institution. It must consider the nature of the relationship between the employer and the employee.[10] If any or all of the reasons asserted for dismissal are religious, the trial court can use the case-by-case approach to determine those rare cases where a lay employee's relationship with a religious institution is so pervasively religious that even mere pretext inquiry poses a significant risk of First Amendment infringement. We believe this approach is fully consistent with our prior admonition that summary judgments should seldom be used in cases alleging employment discrimination because of the special category in which Congress and the Supreme Court visualized these cases. Hillebrand v. M-tron Industries, 827 F.2d 363, 364 (8th Cir.1987), cert. denied, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989). Because, on the record before us, the Temple has asserted no religious grounds for Weissman's termination, his ADEA claim does not pose a significant risk of infringement upon the Constitution. He will be able to challenge the stated reasons for his dismissal as pretextual without having to call into question any aspect of religious doctrine or practice.
 
 III. CONCLUSION
 
 19
 For the reasons stated above, the judgment of the district court is reversed and the case is remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 The case was referred to a magistrate judge for trial with the consent of the parties pursuant to 28 U.S.C. Sec. 636(c)
 
 
 [2]
 Section 630(b) provides in pertinent part: "The term 'employer' means a[n] [association] engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year...."
 
 
 [3]
 Cf. Hernandez v. Commissioner, 490 U.S. 680, 697, 109 S.Ct. 2136, 2147, 104 L.Ed.2d 766 (1989) (holding that certain "donations" for services from the Church of Scientology were not tax deductible; "[R]outine regulatory interaction which involves no inquiries into religious doctrine, no delegation of state power to a religious body, and no 'detailed monitoring and close administrative contact' between secular and religious bodies does not of itself violate the nonentanglement command.") (internal citations omitted)
 
 
 [4]
 In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court set out the burden-shifting scheme for a Title VII claim of racial discrimination. This court has held that the guidelines set forth in McDonnell Douglas are applicable to cases arising under the ADEA. Johnson v. Minnesota Historical Soc'y, 931 F.2d 1239, 1242 (1991). To establish a prima facie case of age discrimination, the plaintiff must show that the defendant discharged him under circumstances which gave rise to an inference of unlawful discrimination. Id.; see also Halsell v. Kimberley-Clark Corp., 683 F.2d 285, 289 (8th Cir.1982), cert. denied, 459 U.S. 1205, 103 S.Ct. 1194, 75 L.Ed.2d 438 (1983). Once the plaintiff sets forth a prima facie case and the defendant responds by offering evidence of a non-discriminatory reason, the plaintiff may rely on the prima facie case or go further and attempt to show the defendant's reasons were pretextual. Johnson, 931 F.2d at 1242
 
 
 [5]
 See also NLRB v. Hanna Boys Center, 940 F.2d 1295 (9th Cir.1991) (narrowly interpreting Catholic Bishop to apply only to cases involving teachers at parochial schools), cert. denied, --- U.S. ----, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992)
 
 
 [6]
 We agree with the Second and Third Circuits' understanding of Scharon v. St. Luke's Episcopal Presbyterian Hosp., 929 F.2d 360 (8th Cir.1991) (Scharon), as a case which stands for the proposition that "a spiritual employee who also perform[s] spiritual duties" cannot seek relief under the ADEA for adverse employment action by her religious employer. Id. at 362; see Geary v. Visitation of the Blessed Virgin Mary Parish Sch., 7 F.3d 324, 331 (3d Cir.1993); DeMarco v. Holy Cross High School, 4 F.3d 166, 171 (2d Cir.1993). The Temple relies heavily on Scharon and other discrimination cases involving clergy to support its argument on appeal. These cases, however, deal with very specific exceptions to the general application of the ADEA and Title VII. See, e.g., Minker v. Baltimore Annual Conference of United Methodist Church, 894 F.2d 1354 (D.C.Cir.1990) (holding an ordained minister's age discrimination suit would violate the Free Exercise Clause); McClure v. Salvation Army, 460 F.2d 553 (5th Cir.) (holding that a minister's sex discrimination suit brought under Title VII would violate the Free Exercise Clause), cert. denied, 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972). We decline to expand this exception to the ADEA to cover employees who are not clergy
 
 
 [7]
 In the memorandum and order which denied Weissman's motion to reconsider, the district court distinguished Geary and DeMarco on the grounds that in both cases, the parochial schools were sued, but their affiliated churches were not. 839 F.Supp. 680, 683 (1993). The district court attempted to show that an institution like a temple or church is more pervasively religious and therefore should be immune from ADEA scrutiny. Id. This conclusion ignores the Supreme Court's view that "parochial schools involve substantial religious activity and purpose." Lemon v. Kurtzman, 403 U.S. 602, 616, 91 S.Ct. 2105, 2113, 29 L.Ed.2d 745 (1971) (Lemon)
 
 
 [8]
 In Scharon, we emphasized the limited scope of the decision and provided guidance for subsequent ADEA cases involving religious employers: "We have confidence that courts will continue to consider these situations on a case-by-case basis, looking in each case to see whether the plaintiff's employment discrimination claim can be adjudicated without entangling the court in matters of religion." 929 F.2d at 363 n. 3. Indeed, this approach was expressly provided for in the legislative history of the ADEA:
 The case by case basis should serve as the underlying rule in the administration of the legislation. Too many different types of situations in employment occur for the strict application of general prohibitions and provisions. It is enough that the bill outlines a national policy against discrimination in employment on account of age, provides a vehicle for enforcement of the policy, and establishes broad guidelines for its implementation.
 H.R.Rep. No. 805, 90th Cong., 1st Sess. (1967), reprinted in 1967 U.S.C.C.A.N. 2213, 2220.
 
 
 [9]
 On a strikingly similar point, the Geary court stated:
 Regarding Geary's religious duties, Visitation School explained that "[t]he unique and important role of the elementary school teacher in the Catholic education system mandates [a] commitment to the philosophy and principles of the Catholic Church." We believe, however, that notwithstanding Geary's apparent general employment obligation to be a visible witness to the Catholic Church's philosophy and principles, a court could adjudicate Geary's claim without entanglement that would follow were employment of clergy or religious leaders involved.
 7 F.3d at 331 (citation omitted).
 
 
 [10]
 "Judicial caveats against entanglement must recognize that the line of separation, far from being a 'wall,' is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." Lemon, 403 U.S. at 614, 91 S.Ct. at 2112