**Patricia A. PATSAKIS,
et al., Plaintiffs,**

v.

**GREEK ORTHODOX ARCHDIOCESE
OF AMERICA, et al., Defendants.**

**Civil Action No. 03–1851.**

United States District Court,
W.D. Pennsylvania.

Oct. 6, 2004.

Samuel J. Cordes, Colleen Ramage Johnston, OGG, Cordes, Murphy & Ignelzi, Pittsburgh, PA, for Plaintiffs.

## *OPINION*

HARDIMAN, District Judge.

In this Title VII action, plaintiffs Patricia A. Patsakis and Angela Sklavos allege gender discrimination and hostile work environment against the Greek Orthodox Archdiocese of America (Archdiocese) and Greek Orthodox Diocese of Pittsburgh (Diocese of Pittsburgh). Although defendants answered Sklavos' claims, they seek dismissal of Patsakis' claims, arguing lack of subject matter jurisdiction under the "ministerial exception" to Title VII. The court held an evidentiary hearing on May 6, 2004 and the parties submitted proposed findings of fact and conclusions of law. After careful consideration of the evidence presented at the hearing and the submissions of counsel, the court finds that subject matter jurisdiction exists over Patsakis' claims.

## I. Findings of Fact

The Greek Orthodox Church (Church), like most religious organizations, is hierarchical in structure. The Archdiocese of the United States is governed by an archbishop and eight metropolitan bishops who oversee their respective metropolises, of which Pittsburgh is one. The Pittsburgh metropolis includes fifty-two parishes in most of Pennsylvania, West Virginia and parts of Ohio. In addition, a Greek women's philanthropic organization known as the Philoptochos Society is usually present at each parish. The Metropolitan of the Diocese of Pittsburgh, Maximos Aghiorgousis (Bishop), has served in that role for the past twenty-five years. He has ultimate authority over the Pittsburgh Diocese, and his staff acts on his behalf. From time to time the Bishop delegates his authority to members of his staff, such as the registrar and chancellor.

The position of registrar largely involves the administrative review and record-keeping of sacramental documents submitted to the Bishop by priests within the Diocese. The registrar ensures that baptisms, chrismations, weddings, divorces, and funerals are conducted, reported, processed, and

recorded correctly. The registrar also reviews and organizes files for parish council ratifications. While the registrar position is administrative, the position of chancellor involves both administrative and pastoral responsibilities. Consequently, a chancellor is normally a priest and is never a layperson. When the position of chancellor is vacant, a layperson may fill it as administrative assistant, but a layperson cannot hold the title of chancellor. Accordingly, women cannot hold the title of chancellor and are not allowed to perform divine liturgies, masses, weddings, baptisms, or funerals in the Greek Orthodox Church.

Patsakis was hired on December 1, 2001 as Registrar of the Pittsburgh Diocese (Registrar). At this time, Father John Panagiotou was serving as Chancellor of the Pittsburgh Diocese (Chancellor). As Registrar, Patsakis received sacramental documents, read them, and then reported to the Bishop if anything was missing or incorrect. Also, all materials for parish council ratifications were sent to Patsakis and she was required to review them, organize the files numerically, and enter the information into a spreadsheet. Patsakis did not complete church sacramental documents; instead, she issued blank documents to priests, who completed the information and returned them. Upon their return, she reviewed the documents on their face to ensure that the information was completed as required based on a checklist that was given to her. If the sacramental documents contained all the requisite information, Patsakis catalogued and filed them without submitting them to the Bishop. If a priest made a mistake, however—for example, by failing to include a birth certificate on a marriage application or by allowing a proposed best man at a wedding to be of a faith other than Greek Orthodox—Patsakis notified that priest and/or the Bishop that the document was missing or incorrect. She never exercised her discretion to determine if any documents were correct under Church doctrine.

Some three months after Patsakis became Registrar, in March of 2002, Father Panagiotou left his position as Chancellor. Faced with a vacancy in the Chancellor's position with no one immediately available to fill it, the Bishop devised a solution. He temporarily split the Chancellor position into two separate positions: a "Pastoral Vicar," who would perform the spiritual functions formerly performed by the Chancellor, and an "Administrative Vicar," who would perform the administrative functions. Deacon Euripides Christiludes was appointed Pastoral Vicar and Patsakis was appointed Administrative Vicar. Neither of these positions, nor even the title "Vicar" itself, is formally recognized in the Greek Orthodox faith, however. The Bishop split the position out of necessity; he wanted Patsakis to fulfill the administrative duties of Chancellor but, consistent with the teachings of the Church, Patsakis could not perform the position's spiritual functions because she is not ordained. Thus, as Pastoral Vicar, Deacon Euripides handled questions from priests regarding religious matters, and Patsakis, as Administrative Vicar, was, in the Bishop's words, his "administrative helper." Furthermore, the Bishop periodically referred to Patsakis as his "Chancellorette," though that title is not officially recognized by the Church.

As Administrative Vicar, Patsakis reviewed the mail with the Bishop on a daily basis, and drafted letters for his signature. Some letters were signed by the Bishop, his signature stamp was affixed to others, and Patsakis signed some letters under her own name. For example, she prepared letters to judges regarding the inability of the Bishop and parish priests to sit as jurors in civil or criminal matters,

and she wrote thank you letters to donors. Generally, these were form letters found in the computer and she gave them to the Bishop for his approval. The Bishop normally reviewed and approved all correspondence sent from the Diocese, but on at least one occasion, Patsakis prepared a letter to the parish council in York, Pennsylvania on behalf of the Bishop, which the Bishop directed but did not review before it was sent.

Patsakis also liaised between the Bishop on the one hand and clergy and laity on the other hand. Patsakis corresponded with parish priests regarding the Bishop's schedule and the clergy-laity assemblies. Similarly, she received complaints and repeated them to the Bishop, who then decided how to handle them. Patsakis also corresponded with parishes regarding their annual monetary commitments/assessments under the Total Commitment Program, though there is no indication that she had authority to set the amounts of such commitments. Finally she handled the finances for the youth ministry.

In an Archdiocese "Employee Profile," Patsakis listed her job as Administrator/Registrar and listed her responsibilities as follows: overseeing administrative operations, working with His Eminence (the Bishop), registry, coordinating office resources, and working on parish assessments. For most of Patsakis' time at the Diocese of Pittsburgh, the Bishop was her immediate and only supervisor.

Worried that some within the Diocese felt she was not performing all the tasks she was given, Patsakis composed a memorandum in June 2002 in which she documented her concerns and frustrations. Patsakis noted that she was hired ostensibly as Registrar but was advised that she would also serve informally as "Camp Coordinator for the Camp at Mount Tabor." She also stated that after Father Panagiotou's departure, she had been called upon to assume the duties of Chancellor in addition to her duties as Registrar and Mount Tabor Camp Coordinator. The Bishop called her his "Chancellorette" and announced on many occasions that she had become "Diocesan Administrator." Patsakis lamented that, in addition to her duties as Registrar, "[b]udget and assessment tasks were heaped upon [her] from the Archdiocese" and that she had been called upon to "mediate parochial problems" at parishes in Youngstown, Cleveland, and York. She also complained that taking the Bishop to doctors' appointments and arranging his health insurance coverage had distracted her from her many other duties.

## II. Standard of Review

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the movant may make a facial or a factual challenge to subject matter jurisdiction. *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977). A factual challenge, like the one defendants make here, challenges the court's power to hear the case. In *Mortensen,* the Court of Appeals for the Third Circuit articulated the standard of review as follows:

> [I]n a factual 12(b)(1) motion ... there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist.

*Id.* The propriety of asserting the "ministerial exception" defense through a

12(b)(1) motion, as defendants have done here, is well-established. *See Alicea–Hernandez v. Catholic Bishop of Chi.*, 320 F.3d 698 (7th Cir.2003); *Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940 (9th Cir.1999); *Combs v. Cent. Tex. Annual Conference of the United Methodist Church*, 173 F.3d 343 (5th Cir.1999); *Bryce v. Episcopal Church in the Diocese of Colo.*, 121 F.Supp.2d 1327 (D.Colo.2000); *Smith v. Raleigh Dist. of the N.C. Conference of the United Methodist Church*, 63 F.Supp.2d 694 (E.D.N.C.1999); *EEOC v. Roman Catholic Diocese*, 48 F.Supp.2d 505 (E.D.N.C.1999).

### III. Analysis

■ This case presents a potential clash between essential civil and constitutional rights. Title VII of the Civil Rights Act of 1964 bars discrimination against employees on the basis of race, religion, gender, and national origin. 42 U.S.C. § 2000e–2(a). The First Amendment to the United States Constitution states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. CONST. amend. I. The Free Exercise Clause has been interpreted to allow religious organizations the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116, 73 S.Ct. 143, 97 L.Ed. 120 (1952). The Free Exercise Clause also protects the right of religious organizations to choose ministers without government restriction. *Id.; Rayburn v. Gen. Conference of Seventh–Day Adventists*, 772 F.2d 1164, 1167 (4th Cir.1985) ("perpetuation of a church's existence may depend upon those whom it selects to preach its values, teach its message, and interpret its doctrines"). The question presented here is whether Patsakis' claims under Title VII would violate defendants'

First Amendment rights under the Free Exercise Clause such that the court lacks jurisdiction to hear her complaint.

■ Congress addressed the inherent tension between Title VII and the Free Exercise Clause when it exempted religious employers from the statute's prohibition of religion-based discrimination. 42 U.S.C. § 2000e–1(a); *see also Little v. Wuerl*, 929 F.2d 944, 947–49 (3d Cir.1991) (subjecting religious employer to a claim of religious discrimination would raise substantial questions under the Religion Clauses). But the statutory exemption does not relieve religious employers of liability for employment discrimination pertaining to the other protected classes enumerated in Title VII, such as race, sex, or national origin. *Rayburn*, 772 F.2d at 1166–67. Thus, Congress left to the judiciary the task of deciding how Title VII applies to religious organizations. The judiciary's response, first articulated by the Court of Appeals for the Fifth Circuit in *McClure v. The Salvation Army*, 460 F.2d 553 (5th Cir.1972), was to create a "ministerial exception," which exempted the employment relationship between churches and their ministers from Title VII. The *McClure* court reasoned:

> We find that the application of the provisions of Title VII to the employment relationship existing between ... a church and its minister would result in an encroachment by the State into an area of religious freedom which it is forbidden to enter by the principles of the free exercise clause of the First Amendment.... Congress did not intend, through the non-specific wording of the applicable provisions of Title VII, to regulate the employment between church and minister.

*Id.* at 557.

*McClure* has been cited with approval by almost all courts of appeals, but its

ministerial exception, now thirty-two years old, has never been considered by the Supreme Court. *See generally,* Janet S. Belcove–Shalin, *Ministerial Exception and Title VII Claims: Case Law Grid Analysis,* 2 Nev. L.J. 86 (1999); Laura L. Coon, *Employment Discrimination by Religious Institutions: Limiting the Sanctuary of the Constitutional Ministerial Exception to Religion–Based Employment Decisions,* 54 Vand. L.Rev. 481 (2001). It is clear that certain civil rights claims are barred by the Free Exercise Clause under the ministerial exception, but the boundaries of the doctrine remain murky. Although the phrase "ministerial exception" would seem to apply only to clergy, several courts have extended the doctrine to claims by lay employees of religious institutions when they serve a function sufficiently similar to that served by clergy. *See, e.g., Shaliehsabou v. Hebrew Home of Greater Wash.,* 363 F.3d 299, 307, *reh'g en banc denied* 369 F.3d 797 (4th Cir.2004) (kosher food supervisor deemed a minister); *Alicea–Hernandez,* 320 F.3d at 704 (Hispanic communications manager deemed a minister); *EEOC v. Roman Catholic Diocese of Raleigh,* 213 F.3d 795, 805 (4th Cir.2000) (music director deemed a minister). However, "the exception does not apply to the religious employees of secular employers or to the secular employees of religious employers." *Shaliehsabou,* 363 F.3d at 307.

Although the Court of Appeals for the Third Circuit has not addressed the issue presented in this case, it has followed *McClure* and approved of the ministerial exception in the context of religious discrimination. *See Little,* 929 F.2d at 947; *Geary v. Visitation of the Blessed Virgin Mary Parish Sch.,* 7 F.3d 324, 329 (3d Cir.1993). Furthermore, this court is unaware of any case that has declined to apply the ministerial exception to other federal employment statutes such as the Americans with Disabilities Act (ADA), the Age Discrimination in Employment Act (ADEA) or the Fair Labor Standards Act (FLSA). *See, e.g., Starkman v. Evans,* 198 F.3d 173, 175 (5th Cir.1999) (ADA); *Weissman v. Congregation Shaare Emeth,* 38 F.3d 1038, 1039 (8th Cir.1994) (ADEA); *Shaliehsabou,* 363 F.3d at 301 (as applied to FLSA); *but see Shaliehsabou v. Hebrew Home of Greater Wash.* 369 F.3d 797, 798 (4th Cir.2004) (Luttig, J., dissenting from denial of rehearing *en banc* ) (objecting to application of ministerial exception in FLSA cases).

■ In determining whether an employee is barred from bringing a civil rights claim by the ministerial exception, courts have looked beyond the title of plaintiff's employment and scrutinized the "primary duties" of the position. *Alicea–Hernandez,* 320 F.3d at 703; *Shaliehsabou,* 363 F.3d at 307. Employees whose duties are "important to the spiritual and pastoral mission of the church" are deemed ministers. *Rayburn,* 772 F.2d at 1168–69; *EEOC v. Southwestern Baptist Theological Seminary,* 651 F.2d 277 (5th Cir.1981). "If the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship, he or she should be considered clergy." *Rayburn,* 772 F.2d at 1169 (internal quotation marks omitted).

More recently, the Court of Appeals for the Fifth Circuit articulated an alternative three part test, directing courts to weigh: (1) whether employment decisions regarding the position at issue are made largely on religious criteria; (2) whether the plaintiff was qualified and authorized to perform the ceremonies of the church; and (3) whether the plaintiff engaged in activities traditionally considered ecclesiastical or religious, including whether the plaintiff

"attends to the religious needs of the faithful." *Starkman,* 198 F.3d 173, 176–77 (citing *Southwestern Baptist,* 651 F.2d at 284). The tripartite test enunciated by the Fifth Circuit Court is an expansion of the "primary duties" test, which is subsumed by its third prong.

In the instant case, there is little dispute about Patsakis' actual duties, although the parties characterize them quite differently. The crux of Patsakis' argument is that her duties were merely administrative and that she had no authority to make policy, interpret doctrine, perform religious rituals, or to compose the communications that bore her signature. Defendants argue that Patsakis was the gatekeeper to marriages and other religious ceremonies, that she spoke for and represented the Diocese and the Bishop, and was integral to Church governance.

### A. Patsakis is not a minister under the "primary duties" test.

#### 1. *Patsakis' duties as Registrar do not make her a minister.*

In her role as Registrar, Patsakis acted principally as a record-keeper. She collected and maintained Church documents and ensured that they contained all of the necessary information. Ultimately, it was each individual priest's responsibility to ensure that the documents were accurate; Patsakis could not independently rule on the doctrinal legitimacy of documents submitted to her.

■ The court finds that these duties are primarily clerical and do not rise to the level of pastoral or ministerial duties. Filing and organizing documents, whether they are religious documents or tax forms, is a clerical function. Though defendants correctly note that Patsakis was responsible for ensuring that documents were in order, she performed a primarily clerical

role in doing so. There is no evidence that Patsakis' duties as Registrar required any heightened religious knowledge or spiritual involvement. She had no authority to make judgment calls in borderline cases and any nonconforming documents were brought to the attention of the Bishop. Accordingly, Patsakis' duties as Registrar were not sufficiently important to the spiritual and pastoral mission of the Church to make her a minister.

#### 2. *Patsakis' duties as Administrative Vicar do not make her a minister.*

■ By the time Patsakis became Administrative Vicar of the Diocese, she wore many hats. She discharged a congeries of administrative duties, including managing the offices, drafting letters, relaying problems to the Bishop, and handling finances for the youth ministry. In her June 2002 memorandum, Patsakis claimed to be overwhelmed with her many responsibilities for the Church. That memorandum, which was clarified at the evidentiary hearing, shows the significance of Patsakis' role in the administrative functioning of the Church, but it does not indicate any pastoral or spiritual significance. Furthermore, she complains in the letter that she had to take the Bishop to doctor's appointments and call to arrange for his insurance coverage. Such duties, while undoubtedly helpful to the Bishop, are neither pastoral nor spiritual.

In addition, Patsakis' role in communication does not rise to the level of ministerial function. Defendants argue that because Patsakis drafted letters for the Bishop and posted them herself, she is akin to the plaintiff in *Alicea–Hernandez, supra.* Unlike Patsakis, however, the plaintiff in *Alicea–Hernandez* had a seminal role in communications; she was responsible for press releases and church publications in addi-

tion to representing the church at community events. *Id.* at 700. The Seventh Circuit Court of Appeals relied heavily on the fact that the plaintiff was "the primary communications link to the general populace." *Id.* at 704. Here, though Patsakis drafted letters for the Bishop and occasionally sent form letters under her own name, such duties are essentially clerical and do not rise to the level of the communications director function in *Alicea–Hernandez.* There is no evidence that Patsakis drafted or sent any correspondence to the general populace, and no evidence that any of the correspondence with which she was involved was of nearly the significance of the press releases and church publications deemed significant by the Seventh Circuit Court in *Alicea–Hernandez.*

Likewise, the court finds *Shaliehsabou* and *Diocese of Raleigh* factually inapposite, as both involve participation in religious rituals. *See Shaliehsabou,* 363 F.3d at 309 (as kosher inspector, plaintiff "supervised and participated in religious ritual and worship"); *Diocese of Raleigh,* 213 F.3d at 802 (music director deemed minister because music is "an integral part of Catholic worship and belief"). Here, there is no evidence that Patsakis performed or participated in any religious ritual. In fact, there is substantial evidence that she could not have done so because of her gender; though not a prerequisite to the application of the exception, *see Diocese of Raleigh,* 213 F.3d at 801, the fact that Patsakis is not ordained is probative.

Additionally, Patsakis' role as liaison between the Bishop and his flock does not rise to the ministerial level. Although Patsakis was informed of problems that required the Bishop's attention, there was no evidence that she ever exercised any independent judgment to solve them. She merely relayed problems to the Bishop and then acted as he instructed.

In sum, despite the fact that Patsakis was heavily involved in the administration of the Church as Administrative Vicar, there is no indication that she was ever involved in spiritual or pastoral matters. As Bishop Maximos testified at the hearing: "an Administrative Assistant (Vicar) cannot handle spiritual matters."

### 3. *Patsakis' other duties do not render her a minister.*

Defendants maintain that Patsakis mediated a dispute between two parishes and argue that she should be deemed a minister as a result. The court disagrees for two reasons. First, despite the fact that Patsakis claimed in her June memorandum that she mediated a dispute, the Bishop testified that he did not send Patsakis to mediate parish problems because a parish would not have respected her. Second, even if Patsakis had acted as a mediator in this one case, there is no evidence that this was one of her principal duties. The mere fact that a lay employee discharges episodic religious duties does not shield a religious employer under the ministerial exception *per se;* under the *McClure* test, the court scrutinizes the employee's *primary* duties as a whole. *Accord Weissman,* 38 F.3d at 1045 (holding the mere fact that a claimant under the ADEA has some religious duties does not pose a significant risk of infringement upon First Amendment rights). If Patsakis in fact mediated a dispute between parishes, it was an isolated event and is not sufficient to make her a minister under the "ministerial exception."

Likewise, Patsakis' additional roles in the Total Commitment Program and as camp coordinator of the Mount Tabor Youth Ministry do not make her a minister. There is no evidence that Patsakis was involved with setting monetary commitments for the Total Commitment Pro-

gram. Had she coordinated a religious message for the youth ministry as camp coordinator, this case might be different. The camp is in the planning stages and does not yet exist, and Patsakis merely handled the finances and performed other administrative functions related to its establishment. These tasks, while important, are not vital to the spiritual or pastoral care of the Church. *See id.* (holding the "overwhelming majority" of a Jewish temple administrator's responsibilities, which included maintaining financial records, were "wholly secular").

### B. Patsakis is not a minister under the *Starkman* test.

Alternatively, the court finds that Patsakis is not a minister under the test enunciated by the Court of Appeals for the Fifth Circuit in *Starkman.* Under that test, courts must weigh: (1) whether employment decisions regarding the position at issue are made largely on religious criteria; (2) whether the plaintiff was qualified and authorized to perform the ceremonies of the church; and (3) whether the plaintiff engaged in activities traditionally considered ecclesiastical or religious, including whether the plaintiff "attends to the *religious* needs of the faithful." *Starkman,* 198 F.3d at 176–77 (emphasis added). First, there is no indication that decisions regarding either position Patsakis held were made on religious criteria. In fact, the decision to *exclude* Patsakis from consideration as Chancellor was dictated by religious doctrine, which requires that only men hold the position. Additionally, Administrative Vicar is not a title recognized by the Greek Orthodox Church. Second, it is undisputed that Patsakis was not authorized to perform religious ceremonies. Third, as stated previously, Patsakis' duties were primarily administrative rather than religious, and her role in attending to the religious needs of the faithful, if any, was *de minimis.* Accordingly, the court finds that Patsakis was not a minister under the *Starkman* test.

### IV. Conclusion

For purposes of the ministerial exception, whether an individual is important to the administrative functioning of the Church is critically less significant than whether she is important to the spiritual functioning of the Church. The lowest ranking nun or monk in the abbey is still a minister, whereas a clerical or administrative employee, no matter how indispensable, is not. Patsakis had many important roles within the Church, and the Bishop delegated significant responsibilities to her. But her primary duties were not sufficiently "important to the spiritual and pastoral mission of the church," *Rayburn,* 772 F.2d at 1168–69, to render her a "minister" for purposes of the ministerial exception.[1]

An appropriate order follows.

### *ORDER OF COURT*

AND NOW, this 6th day of October, 2004, it is hereby ORDERED that Defendants shall file a response to the claims of Plaintiff Patsakis on or before October 27,

---

1. Finally, the court notes that, on the present state of the record, defendants have not provided a religious reason for Patsakis' termination, and the court makes no determination at this time on that issue. Indeed, to delve into the reasons for Patsakis' termination before deciding whether she is a "minister" would enmesh the court in the very investigation and review of church matters that the ministerial exception was designed to prevent. *See Alicea–Hernandez,* 320 F.3d at 703 (emphasizing that the only question before the court is the appropriate characterization of employee's position, and not the secular or religious reason for alleged mistreatment).

2004; it is further ORDERED that an initial case management conference in this case will be held at 1:30 p.m. on November 1, 2004 in Room 1014 of the United States Post Office and Courthouse, 700 Grant Street, Pittsburgh, Pennsylvania, 15219. Pursuant to Rule 26(f), the attorneys of record who have appeared in the case are jointly responsible for submitting to the Court on or before October 29, 2004, a written report outlining their discovery plan. (A form of discovery plan is attached hereto as Exhibit A). ***This Court requires strict compliance with Rule 26.***

Counsel should be familiar with this Court's Practices and Procedures (see Court Practices and Procedures at *www.pawd.uscourts.gov,* link "court practice.")