Kathleen PARDUE, Appellant,

v.

The CENTER CITY CONSORTIUM SCHOOLS OF the ARCHDIOCESE OF WASHINGTON, INC., et al., Appellees.

No. 03–CV–1270.

District of Columbia Court of Appeals.

Argued May 12, 2005.

Decided June 9, 2005.

R. Scott Oswald, Washington, DC, for appellant.

Lisa M. Duggan, with whom Emmet T. Flood, Washington, DC, was on the brief, for appellees.

Before FARRELL and GLICKMAN, Associate Judges, and MOTLEY, Associate Judge, Superior Court of the District of Columbia.*

FARRELL, Associate Judge:

Appellant Kathleen Pardue ("Pardue" or "appellant") sued the Archdiocese of Washington and others (collectively "the Archdiocese") under the District of Columbia Human Rights Act (the DCHRA) alleging discrimination and retaliation based on race.[1] Pardue contended that the Archdiocese had unlawfully terminated her contract as principal of the St. Francis Xavier elementary school in the District. The termination was alleged to

---

* Sitting by designation pursuant to D.C.Code § 11–707(a) (2001).

1. The complaint also alleged two counts of common law breach of contract and a count of defamation (the latter subsequently withdrawn).

be part of a campaign by Mary Anne Stanton, the Executive Director of the Center City Consortium Schools of the Archdiocese of Washington, Inc., and others, "to eliminate Caucasian principals and replace them with less-qualified African–American [p]rincipals." The trial court, Judge Boasberg, after allowing substantial but limited discovery, dismissed the complaint primarily on First Amendment grounds, concluding that the Free Exercise Clause—specifically the "ministerial exception" (as in religious "minister") recognized by a large number of courts—bars civil courts from adjudicating employment discrimination claims by ministers and similar persons exercising religious functions against the religious institution employing them.[2] For the reasons that follow, we uphold the decision of the trial court.

## I.

St. Francis Xavier is one of several Roman Catholic elementary schools making up The Center City Consortium Schools of the Archdiocese of Washington, Inc. The Consortium is a non-profit corporation organized for charitable, religious, and educational purposes. Formed by the Archdiocese of Washington, D.C., it linked together, at the time, eight Catholic inner-city elementary schools to coordinate academics and curriculum, including religious instruction, finances, development, recruitment, community relations, professional development, facilities, procurement and personnel for member schools.

Ms. Pardue served as the principal of St. Francis Xavier School from mid–1996 until January 18, 2002, when, according to the complaint, she was forced to resign to avoid being terminated immediately and not receiving the remaining payments on her one-year contract. In her lawsuit, she alleged that when she inquired why she was effectively being fired, she was told that it was "because of alleged poor enrollment numbers and lack of leadership skills," but that the real reason was her race as a Caucasian. (She alleged in particular that her replacement was a non-Catholic African–American less qualified and with significantly less experience.) The Archdiocese moved to dismiss the lawsuit principally on the ground that the Free Exercise and Establishment Clauses of the First Amendment deprived the court of subject matter jurisdiction over what essentially was an ecclesiastical dispute. Factually, the Archdiocese asserted that the reasons why Pardue had been asked to resign included her "lack of commitment to a full program of regular religious instruction" at the school and her "poor working relationship with the pastor" of the school parish. But, it asserted, Pardue should not in any event be permitted to explore through civil discovery the ecclesiastical reasons supporting her termination.

Judge Boasberg initially ruled that, to help frame the issues more clearly for him, the parties could "conduct discovery (consisting of interrogatories, document requests, and requests for admission only) on the limited topic of the role and position of the principal of St. Francis Xavier School." After receiving and considering these materials, the judge concluded in a carefully written opinion that the court lacked subject matter jurisdiction over Pardue's claims of discrimination and retaliation under the DCHRA. These claims, he ruled, were barred by the First Amendment, in particular the "ministerial exception" to the applicability of federal

2. Besides dismissing the DCHRA counts on First Amendment grounds, the court rejected Pardue's contract claims for reasons discussed in part III, *infra.*

anti-discrimination statutes first articulated in *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir.1972), and followed by numerous courts since then. As explained by the District of Columbia Circuit, the exception holds that "the Free Exercise Clause exempts the selection of clergy from Title VII and similar statutes and, as a consequence, precludes civil courts from adjudicating employment discrimination suits by ministers against the church or religious institution employing them." *EEOC v. Catholic Univ. of Am.*, 317 U.S.App. D.C. 343, 349, 83 F.3d 455, 461 (1996). Pointing out that the exception, as applied by the courts, "encompasses all employees of a religious institution, whether ordained or not, whose primary functions serve its spiritual and pastoral mission," *id.* at 351, 83 F.3d at 463, Judge Boasberg analyzed the position of principal at St. Francis Xavier applying the "primary duties" test—endorsed by both sides—enunciated in *Rayburn v. General Conference of Seventh–Day Adventists*, 772 F.2d 1164 (4th Cir.1985):

> As a general rule, if the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship, he or she should be considered "clergy." This approach necessarily requires a court to determine whether a position is important to the spiritual and pastoral mission of the church.

*Id.* at 1168 (citations and internal quotation marks omitted). The judge cited documentary evidence that the Catholic schools in the Archdiocese have a "pervasive religious mission" and that "the principal of each school has a significant religious and spiritual role in furthering that mission." He noted also Pardue's admission that "the ... school is operated in accordance with the teachings and doctrines of the Roman Catholic Church as

delineated and set forth by the Ordinary of Washington," and that "she was responsible for hiring teachers who could teach the Catholic courses ... [and] made certain that students attended mass pursuant to Archdiocesan policy and guidelines." In sum, the judge concluded:

> [T]he principal, along with the pastor [of St. Francis Xavier parish], is the person who leads the school, the person who communicates the school's message to the faculty, staff, students and parents. Given the role the schools play in the Archdiocese and the role the principal plays at the school, it is clear that [Pardue's] "position is important to the spiritual mission of the church" ... and that her "primary duties consist of teaching [and] spreading the faith." Indeed, the selection of [Pardue] to be principal of the school "places the imprimatur of the church upon that person as a worthy Spiritual leader." Given [Pardue's] role, the Court finds that she fits within the ministerial exception, thus depriving the Court of subject matter jurisdiction to consider [her claims under the DCHRA]. [Citations omitted].

## II.

Judge Boasberg noted that this court "has not directly considered the existence or scope of the 'ministerial exception.'" While that is true especially as to the scope of the exception—*i.e.*, who, other than an actual clergy person, may be barred from challenging an employment decision—the court has all but expressly adopted the exception in previous cases where actual ministers and pastors challenged their termination or other adverse actions affecting their employment. Thus, in *United Methodist Church, Baltimore Annual Conference v. White*, 571 A.2d 790 (D.C.1990), we relied significantly on the

exposition of First Amendment principles in *Rayburn, supra,* when we explained: [t]he right to choose a minister without judicial intervention "underlies the well-being of religious community, for perpetuation of a church's existence may depend upon those whom it selects to preach its values, teach its message, and interpret its doctrines both to its own membership and the world at large." Any attempt by the civil courts to limit the church's choice of its religious representatives would constitute an impermissible burden on the church's First Amendment rights.

*Id.* at 794 (citing *inter alia* and quoting *Rayburn,* 772 F.2d at 1167–68). Although we recognized that "courts of appeal have held that the church is not above the law and may be held liable," among other things, "for valid contracts," *id.* at 795, we concluded that the complaint by White, an ordained Methodist minister, for reinstatement and damages stemming from his divestment from religious office could not properly be evaluated without intrusion into "church polity and practices," *id.* at 795, "matters protected from secular judicial scrutiny." *Id.* at 794.

Similarly, in *Heard v. Johnson,* 810 A.2d 871 (D.C.2002), a suit for defamation and other common-law torts by a pastor against a congregation (Mt. Airy Baptist Church) that had removed him from office, we ordered dismissal of the suit because, in the circumstances presented, "resolution of the claim[s] would require an impermissible inquiry into the church's bases for its action." *Id.* at 883. Although, we explained, the Supreme Court had "recognized that the religion clauses allow for some state restriction, weighing the free exercise protections against important state interests requires a 'delicate balanc-

ing.'" *Id.* (quoting *McDaniel v. Paty,* 435 U.S. 618, 628 n. 8, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978)). And "[i]n the specific area of the church-minister relationship, ... courts have expanded the universe of claims that do not overcome the First Amendment protections to include Civil Rights Act protection from race and sex discrimination and a variety of common law claims." *Id.* (citing *inter alia Rayburn, supra*). We held that, because "selection and termination of clergy is a core matter of ecclesiastical self-governance not subject to interference by a state, ... the Free Exercise Clause guarantees Mt. Airy the freedom to decide to whom it will entrust ministerial responsibilities." *Id.* at 882. "Whose voice speaks for the church is *per se* a religious matter." *Id.* at 884 (quoting *Minker v. Baltimore Annual Conference of United Methodist Church,* 282 U.S.App.D.C. 314, 316, 894 F.2d 1354, 1357 (1990)).

 Making explicit what is implicit in the foregoing decisions, we hold that the ministerial exception as applied in the case of federal statutes may be raised as a bar to suits alleging discrimination under the DCHRA. Although "[i]t would ... be difficult to exaggerate the magnitude of [the District's] interest in assuring equal employment opportunities for all, regardless of race, sex, or national origin," *Rayburn,* 772 F.2d at 1168,[3] abundant decisional law from this court and others confirms "the constitutional imperative of governmental non-interference with the ministerial employment decisions of churches." *EEOC v. Roman Catholic Diocese,* 213 F.3d 795 (4th Cir.2000). *See also, e.g., Gellington v. Christian Methodist Episcopal Church, Inc.,* 203 F.3d 1299 (11th Cir.2000); *EEOC v. Catholic Univ. of Am., supra; Young v.*

---

**3.** No one disputes that, as a matter of statutory interpretation, the DCHRA would prohibit termination from employment on the grounds alleged by Pardue.

*Northern Ill. Conference of United Methodist Church,* 21 F.3d 184 (7th Cir.1994); *Natal v. Christian & Missionary Alliance,* 878 F.2d 1575 (1st Cir.1989); *Hutchison v. Thomas,* 789 F.2d 392 (6th Cir.1986); *McClure v. Salvation Army, supra.*[4] But "[w]hile the ministerial exception promotes the most cherished principles of religious liberty, its contours are not unlimited and its application in a given case requires a fact-specific inquiry." *Roman Catholic Diocese,* 213 F.3d at 801. "The ministerial exception does not insulate wholesale the religious employer from the operation of ... anti-discrimination statutes," *id.*; "[f]or instance, the exception would not apply to employment decisions concerning purely custodial or administrative personnel." *Id.*; *see also Heard,* 810 A.2d at 880 ("Civil courts ... may have jurisdiction over employment disputes where the employee provides a purely secular service for the church."). "Rather, the exception shelters certain employment decisions from the scrutiny of civil authorities so as to preserve the independence of religious institutions in performing their spiritual functions." *Roman Catholic Diocese,* 213 F.3d at 801.

We therefore proceed to consider application of the exception to Pardue's claims of discrimination and retaliation under the DCHRA. Preliminarily, however, we must decide what standard of review governs our consideration of Judge Boasberg's decision.

## A.

Courts have resolved claims presenting application of the ministerial exception under Fed.R.Civ.P. 12(b)(1) (lack of jurisdiction over the subject matter), Rule 12(b)(6) (failure to state a claim upon which relief can be granted), and Rule 56 (summary judgment). *See Dolquist v. Heartland Presbytery,* 342 F.Supp.2d 996, 1002 (D. Kan. 2004) (listing cases). Our own decisions most analogous to this case teach that the Archdiocese's motion to dismiss on First Amendment grounds is properly analyzed as a challenge to subject matter jurisdiction under Super. Ct. Civ. R. 12(b)(1). In *Heard* and *White, supra,* as well as *Bible Way Church of Our Lord Jesus Christ of the Apostolic Faith v. Beards,* 680 A.2d 419 (D.C.1996), we treated similar challenges as an "argu[ment] for ... immunity from suit, and for the trial court's corresponding lack of subject matter jurisdiction." *Id.* at 426. *See Heard,* 810 A.2d at 877 (trial court's denial of motion to dismiss under Rule 12(b)(1) presented "question of immunity from suit under the Free Exercise Clause"); *White,* 571 A.2d at 793 (reviewing under Rule 12(b)(1) church's "motion to dismiss on grounds of constitutional immunity"). We accordingly review the judge's order under the standards appropriate to a Rule 12(b)(1) motion. First, "our standard of review is *de novo* because 'the issue of subject matter jurisdiction is a question of law.'" *Heard,* 810 A.2d at 877 (quoting

4. Pardue makes no argument that the validity of the ministerial exception has been called into question by the Supreme Court's decision in *Employment Div., Dep't of Human Res. of Or. v. Smith,* 494 U.S. 872, 879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (holding, in the context of a state's law including religiously inspired peyote use within the reach of its criminal drug statutes, that the right of free exercise "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes ... conduct that his religion prescribes ...."). Although we accordingly have no occasion to treat the issue, we note that "[a]ll circuits to have addressed the question have recognized the continuing vitality of the [ministerial] exception after the [*Smith*] decision." *Roman Catholic Diocese,* 213 F.3d at 800 n *. These include the D.C. Circuit in *Catholic Univ. of Am., supra.*

*Bible Way,* 680 A.2d at 427). Also, whereas a court in deciding an issue on summary judgment must construe the facts in the light most favorable to the plaintiff and draw all reasonable inferences in her favor, *see, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), matters are different when, as in this case, the defendant has made a "factual" attack on the court's subject matter jurisdiction supported by materials outside the face of the complaint. *See Heard,* 810 A.2d at 878 ("The [church] Trustees' 12(b)(1) motion ... was a 'factual' attack because ... it 'challenge[d] the existence of subject matter jurisdiction irrespective of the pleadings, and matters outside the pleadings ... are considered.'") (citations omitted). In such a case "plaintiff bears the burden of proof that jurisdiction does in fact exist," *id.* (citation and quotation marks omitted), and "no presumptions of truthfulness adhere to the allegations of the complaint." *Id.; see Bible Way,* 680 A.2d at 426 n. 4 ("[w]here the motion [to dismiss] concerns matters outside the complaint, it is a 'factual' attack and the court is free to weigh the evidence without any presumptions regarding its truthfulness.").

## B.

■ Applying these standards and the substantive test which the ministerial exception prescribes, we hold that Judge Boasberg correctly found Ms. Pardue's claims under the DCHRA to be barred for lack of subject matter jurisdiction. "Our inquiry ... focuses on 'the function of the position' at issue and not on categorical notions of who is or is not a 'minister.'" *Roman Catholic Diocese,* 213 F.3d at 801.

As mentioned earlier, the "general rule" followed by the cases, and applied by the trial judge here, is that

> "if the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship, he or she should be considered clergy." A court must therefore "determine whether a position is important to the spiritual and pastoral mission of the church" in order to decide whether the ministerial exception applies.

*Id.* (quoting *Rayburn,* 772 F.2d at 1169).[5]

In a case concerning the Roman Catholic elementary schools of Rhode Island, the Supreme Court explained some years ago that "instruction in faith and morals is part of the total educational process" of those schools and that "the parochial schools constituted 'an integral part of the religious mission of the Catholic Church.'" *Lemon v. Kurtzman,* 403 U.S. 602, 615–16, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); *accord NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 501, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) (quoting *Lemon,* 403 U.S. at 602, 91 S.Ct. 2105) ("Religious authority necessarily pervades the [parochial] school system."). Based on the evidence before him, Judge Boasberg found that the relationship of the parochial schools of Washington, D.C. to the Church's mission is no different:

> "The Mission of Catholic Schools in the Church of Washington" is a document that begins: "Catholic schools are rooted in the belief that Jesus, the only mediator between God and man, is alive

---

5. Whether the exception applies involves no inquiry into the reasons alleged by either party for the adverse action in question. "The exception[, if applicable,] precludes any inquiry whatsoever into the reasons behind a church's ministerial employment decision, for the Free Exercise Clause 'protects the act of a decision rather than a motivation behind it.'" *Roman Catholic Diocese,* 213 F.3d at 801 (quoting *Rayburn,* 772 F.2d at 1169).

today within the community of the faithful, the Church. This Church has but one mission: to proclaim the Good News that the Father has reconciled all men to Himself in Jesus." Mot., Tab I, Exh. 10. Similarly, the "Catholic Schools Office Mission Statement" begins: "Central to our belief, our leadership, and our service with and on behalf of the Catholic schools of the Washington Archdiocese is our conviction that ... *the Catholic school is an integral part of the Church's mission to proclaim the Gospel, to build faith communities, to celebrate through worship, to serve others.*" *Id.*, Exh. 6 (italics in original); *see also Id.*, Exh. 9 ("Guiding Principles for the Schools in the Archdiocese of Washington") ("As Christian institutions committed to the teachings of the Catholic Church, Catholic schools prepare students to respond in faith to Jesus Christ and to understand His message ....."). Finally, the "Criteria For Religious Programs" begins: "In order to preserve the uniqueness of the Catholic schools, not only should the Catholic faith permeate all aspects of the life of the school but also each school must offer a program of religious education ....." *Id.*, Tab J at 1; *see also id.*, Tab I, Exh. 12 ("Instructional goals") (first goal states: "Students will master the essentials of Catholic doctrine and principles of morality, understand Catholic liturgy with the Mass as its center, be familiar with the Scriptures, and be able to outline the historical development of the Church.").

In her brief, Pardue does not dispute the pervasive religious mission of the Catholic schools in the Archdiocese, but contends that the trial judge failed to consider the duties actually performed by a principal at one of the Archdiocese's schools. *See* Br. for App. at 15 ("In fact, the trial court never discussed the functions of Pardue's position that caused it to

designate her position as ministerial."). However, the very next portion of the judge's opinion reads:

Given the pervasive religious mission of the Catholic schools in the Archdiocese, it is not surprising to find that the principal of each school has a significant religious and spiritual role in furthering that mission. For example, the "Major Areas of Responsibility" for the principal begins with "spiritual leadership." *Id.*, Tab I, Exh. 5. Likewise, the performance evaluation lists as the first category: "Provides spiritual leadership in and for the school community." *Id.*, Exh. 3. Indeed, the contract that [Pardue] signed obligated her to "aid in the Christian formation [o]f students," *id.*, Exh. 1; ¶ A; [Pardue] therein also "recognize[d] that the ... school is operated in accordance with the teachings and doctrines of the Roman Catholic Church as delineated and set forth by the Ordinary of Washington," *id.*, ¶ C; and she also admitted having "seen and reviewed a copy of the Guiding Principals [*sic*], Goals and Objectives of the Archdiocese of Washington." *Id.*, ¶ E.

Additionally, [Pardue] admitted "she was responsible for hiring teachers who could teach the Catholic courses ... [and] made certain that students attended mass pursuant to Archdiocesan policy and guidelines." Mot., Tab M (Plaintiff's Answers to Interrogatories) at 2. She similarly conceded that "one of her many duties was to work with the pastor to ensure that the administrative aspects of the religious education program [were] being met and were in conformity with the policy and guidelines of the Archdiocese of Washington." Mot., Tab H (Responses to Requests for Admission) at 3.

Despite this evidence of what the judge found to be the principal's essential role in

"communicat[ing] the school's message"—one rooted in religious belief—"to the faculty, staff, student, and parents," Pardue makes essentially two arguments disputing the characterization of her position as ministerial. First, she asserts that the judge unfairly minimized evidence—chiefly in the form of affidavits by former executives in the Archdiocese hierarchy—that most of Pardue's daily responsibilities were "administrative" and basically no different from those performed by her counterparts in public schools. But, as Judge Boasberg recognized, merely enumerating the duties in Pardue's job description, many under secular-sounding headings such as "materials management" and "office management," tells us little about whether her "position is important to the spiritual and pastoral mission of the church." *Rayburn, supra.* Pardue was the chief administrator of an institution both educational and religious. Hence she would certainly be expected to perform numerous duties—secular in appearance—designed to meet public licensing requirements and to maintain the standing of the institution *as* school. But she was also principal of a Roman Catholic school, and thus she, more than anyone else at the school except the pastor, *see* discussion, *infra,* was answerable to the religious authorities for providing, in myriad ways not reducible to a listing of tasks, "spiritual leadership in and for the school community." As the evidence before the trial court makes clear, these many responsibilities—some predominantly "secular" and some predominantly religious—are inextricably intertwined in the school's mission and in the principal's role in fulfilling it.

Appellant further seeks to identify in the materials a clear distinction in the operation of the school between the roles of principal and pastor of the sponsoring church parish. She points to, for example, a statement in the "Guidelines for Pastors and Principals" that, while "the pastor may delegate many of the tasks involved in the administration of the parish school, . . . the pastoral office is morally and canonically such that he can never relinquish his responsibility." These and similar statements, Pardue asserts, unequivocally make the pastor the chief religious educator for the parish school—leaving the "ministerial" function, for First Amendment purposes, exactly where the Archdiocese placed it. But, as the trial judge recognized, even if the principal were subordinate to the pastor in regard to purely religious decisionmaking, "there is no requirement that an individual have the 'final say' on spiritual matters before the ministerial exception can be applied." *Roman Catholic Diocese,* 213 F.3d at 803. And in fact the record shows that the relationship of pastor and principal in the schools of the Archdiocese, rather than one of primacy, is more akin to joint responsibility or coequal authority in carrying out the spiritual objectives of the school. So, for example, the "Guidelines," *supra,* provide that the pastor "in consultation with the principal and religious education coordinator helps select an appropriate set of religious education textbooks"; "along with the principal" he "arranges how he and/or his associates . . . can best reinforce religious education programs of the school"; "in cooperation with the principal" he provides "for school liturgies and parish liturgies for young people"; and "in collaboration with the principal" he "ensures that all archdiocesan educational policies are followed in the local school." This shared responsibility confirms rather than diminishes the ministerial role of the principal, who (the "Guidelines" tell us) "has the dual responsibility of administering an educational institution and at the same time ensuring that it serves the needs of the entire parish community." In this setting of a joint supervisory relation-

ship of principal and pastor, the observation of the court in *Minker*, 282 U.S.App. D.C. at 316, 894 F.2d at 1356, that deciding " 'whose voice speaks for the church' is *per se* a religious matter" rings particularly true.

■■ Appellant's remaining argument, a procedural one, has not been adequately preserved. At oral argument she maintained that Judge Boasberg's order limiting discovery to "interrogatories, document requests, and requests for admission only" denied her the ability through depositions to test and impeach the various documentary submissions by the Archdiocese describing the functions of a school principal. The argument came largely as a surprise, however, because the only mention of it in either of appellant's briefs on appeal is the single statement in the "Summary of the Argument" section of her opening brief that Pardue "was never given the opportunity to ... engage in substantive discovery." Without further explication, that is inadequate to preserve a claim that the discovery limitations unfairly hampered appellant's ability to meet the defendants' jurisdictional attack. Indeed, appellant cites no place where she objected at the trial court level to the limits placed on her discovery; our own review reveals only that when the judge announced in open court his intent to limit discovery, appellant's counsel stated that "we would accept that and would agree with the Court," even though "[w]e would want it a little more expansive." That does not constitute an objection, and at no later point does it appear Pardue ever asked the judge to revisit the limitations on discovery. In any event, the control of discovery lies within the sound discretion of the trial judge, *see, e.g., Kay v. Pick*, 711 A.2d 1251,

1256 (D.C.1998), and particularly "when the First Amendment casts a shadow over the court's subject matter jurisdiction," *Bible Way*, 680 A.2d at 430, the judge acts responsibly in limiting the intrusiveness of the discovery afforded. *See White*, 571 A.2d at 792 (pointing out that the religion clauses "grant churches an immunity from civil discovery and trial under certain circumstances").

## III.

Besides her claims under the DCHRA, Pardue's complaint alleged two counts of breach of contract. The first charged that the Archdiocese had breached an implied covenant of good faith and fair dealing in seeking her resignation as principal; and the second alleged, very narrowly, that the Archdiocese had failed to pay her salary for the month of July 1998.[6] The trial judge ultimately dismissed both claims, and we find no error in that ruling.

■ First, Judge Boasberg did not err in concluding that Pardue's claim of breach of the implied covenant of good faith, no less than her discrimination claims, was barred by the ministerial exception. In essence Pardue alleged that she was terminated for ulterior reasons of race, hence not in "good faith," but, as the judge recognized, evaluation of that claim would require the very inquiry into the Archdiocese's motivation that the Free Exercise Clause forbids. *See Rayburn*, 772 F.2d at 1169 (the clause "protects the act of a decision rather than a motivation behind it"); *White*, 571 A.2d at 795–96 (complaint alleging that plaintiff's "ordination and various church appointments g[a]ve rise to an ... implied covenant[ ] of good faith and fair dealing" should have been dis-

---

6. Appellees assert that even under liberal notice pleading, the complaint failed to make the second allegation with sufficient particularity, an issue it is unnecessary for us to decide.

missed; the "complaint link[ed] the circumstances of his contractual rights and alleged breaches to the circumstances surrounding his ordination and divestment of ecclesiastical endorsement," matters for the church alone to decide); *Bell v. Presbyterian Church,* 126 F.3d 328, 331–32 (4th Cir.1997) (applying ministerial exception to reject claim by ordained minister that his termination breached an implied covenant of good faith and fair dealing).

 Pardue's second claim for breach of contract is that the Archdiocese failed to pay her salary for July 1998. She contends that she had a contract covering the period from August 1, 1997 to July 31, 1998, and a succeeding contract from July 1, 1998, to June 30, 1999. Inadvertently or not, she contends, the defendants agreed to pay her twice for the month during which the two contracts overlapped. We agree with appellees, however, that the three-year statute of limitations for breach of contract barred this claim. *See* D.C.Code § 12–301(7) (2001). The complaint was filed on July 3, 2002, almost four years after the alleged failure to pay Pardue twice. *See Sears, Roebuck & Co. v. Goudie,* 290 A.2d 826, 830 (D.C.1972) (the "statute of limitations in an action for breach of contract ... runs from the time of the breach or completion of the contract"). As the alleged breach occurred in the contract year ending July 31, 1998, any contract claim tied to that date expired in July 2001 (a year or slightly less before Pardue filed her complaint). Appellant makes the strained argument that the breach was "recurring" and continued indefinitely while the month's salary was unpaid—all the way up to her termination in January 2002 (and beyond). She cites no case law for this proposition, and we reject it. Pardue was not, as she asserts, "always behind one [month's] payment"; rather, she was paid in full for each succeeding month of employment. It is the alleged failure to pay her (double) in July 1998 only that gave rise to her claim and marked the accrual of her cause of action. *See Toomey v. Cammack,* 345 A.2d 453, 455 (D.C.1975) ("As a general rule, an actionable claim accrues, and the statute of limitations begins to run, when a suit thereon could first be maintained to a successful conclusion."). Appellant does not contend that she could not reasonably have discovered the claim at that time; rather she knew, or reasonably should have known, when she received her paycheck for that month that it did not reflect a double payment.

The judgment of the Superior Court is

*Affirmed.*