Tamrat G. MEDHIN, Appellant,

v.

Teshome HAILU, Appellee.

No. 09–CV–1415.

District of Columbia Court of Appeals.

Submitted Dec. 8, 2010.

Decided Aug. 11, 2011.

Tamrat Medhin, pro se.

Vanessa Carpenter Lourie, Washington, DC, was on the brief, for appellee.

Before WASHINGTON, Chief Judge, and GLICKMAN and BLACKBURNE–RIGSBY, Associate Judges.

WASHINGTON, Chief Judge:

Appellant Tamrat Medhin challenges the trial court's grant of summary judgment in favor of appellee Teshome Hailu. Hailu sued for a declaratory judgment that funds he had placed in escrow pending resolution of a dispute over a commission fee with Medhin, his real estate broker, belonged to him. Finding that the statute of limitations had run on any claim Medhin may have had to the commission, the trial court granted judgment to Hailu.

On appeal, Medhin argues that the funds held in escrow were presumptively his, and because he would have no reason to sue to obtain his own property, the statute of limitations should not have begun to run until the trial court awarded the funds to Hailu. While it is true that under certain circumstances the placement of disputed funds into an escrow account may extend the limitations period by delaying the onset of an "injury" for statute of limitations purposes, here it is undisputed that Medhin had been aware for over four years that Hailu did not intend to pay him any commission for the sale of the property. Thus, the trial court did not err in granting summary judgment to Hailu since the three-year statute of limitations for bringing breach of contract actions had expired. Accordingly, we affirm.

## I. FACTS

Beginning in 2001, Medhin, who at the time was an agent with the Remax Premiere Selections real estate firm,[1] served as

1. Remax was the listing company in this transaction. Remax was also named as a

Hailu's broker for the purpose of selling a piece of real estate. Medhin participated in negotiating a sales contract between the buyers and Hailu. However, a lawsuit between the buyers and Hailu ultimately resulted in a new contract being negotiated between the parties. Days after the sale closed, Medhin requested a commission ($13,500) pursuant to his original brokerage agreement with Hailu. At that time, Hailu disputed whether Medhin was entitled to a commission and refused to pay. In April 2004, Medhin's attorney[2] wrote a letter to the settlement agent in the Hailu-buyer transaction, stating that Medhin would "pursue his commission claim against any and all persons who act to evade or avoid it . . . as an interference with his contractual rights." Hailu, however, continued to dispute Medhin's entitlement to the commission, although his reasons for doing so are unclear on this record.[3] In any event, the settlement agent responded that "no commission would be paid" to Medhin by Hailu.

However, an escrow fund was set up by Hailu and the buyers to cover any potential claim by Medhin and Remax. The escrow agreement directed the escrow agent to hold the funds until directed to release them in writing by both the buyers and Hailu, or until the "disposition of Commission status has been determined," at which time the escrow agent was instructed to "release [the] funds to the appropriate party—either [Hailu] or [the] listing

company (Remax)." Medhin was not a party to this escrow agreement, and in his brief he asserts that he was not even aware of its existence until Hailu filed his suit for declaratory judgment.

On several occasions after the closing, Hailu contacted Medhin and Remax to ask them to relinquish their claim to the commission payment. Medhin refused, but never took any action to collect the commission. Rather, as Medhin writes in his brief, after being told that "no commission would be paid," he "gave it to God and left it."

Over four years later, Hailu filed a lawsuit seeking a declaratory judgment that the funds in the escrow account belonged to him. Hailu argued that by failing to bring any action to collect the commission, Medhin forfeited any claim he may have had to the commission because the District's three-year statute of limitations for contract-based claims had run.[4] Medhin answered the complaint by asserting that the funds in escrow belonged to him, thus obviating the need for him to file any suit. However, he never responded to Hailu's subsequent motion for summary judgment on the statute of limitations theory. The trial court granted summary judgment to Hailu, concluding that the statute of limitations on any claim Medhin had to the commission had run prior to the filing of the instant matter. Medhin now challenges that ruling.

---

defendant in Hailu's suit, but consented to judgment because it had no financial interest in Medhin's commissions.

2. Medhin has proceeded pro se in this particular litigation.

3. Gleaning from the pleadings below, Hailu's rationale for disputing the commission was either that in the litigation between Hailu and the buyer, Medhin provided testimony that Hailu deemed violative of Medhin's duty to

him as his broker, or that following the buyer-seller suit, the sale was ultimately consummated on a different agreement than the original purchase agreement for which Medhin had advised, or both of these reasons. We do not evaluate the soundness of Hailu's reasons for refusing the commission, however, and mention them only to illustrate the context and timing of Hailu's refusal to pay Medhin.

4. *See* D.C.Code § 12–301(7) (2001).

## II. LEGAL STANDARDS

 We review orders granting summary judgment *de novo*. *See Gilbert v. Miodovnik*, 990 A.2d 983, 987 (D.C.2010) (citations omitted). In doing so, we independently analyze the record in the light most favorable to the non-moving party, drawing all reasonable inferences from the evidence in the non-moving party's favor. *Id.* (citing *EastBanc, Inc. v. Georgetown Park Assocs. II, L.P.*, 940 A.2d 996, 1001–02 (D.C.2008)). We will uphold the grant of summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (citing Super. Ct. Civ. R. 56(c)).

 In general, a "claim ... accrues for statute of limitations purposes when injury occurs." *Doe v. Medlantic Health Care Grp., Inc.*, 814 A.2d 939, 945 (D.C. 2003). We have stated that "[w]hat constitutes the accrual of a cause of action is a question of law; the actual date of accrual, however, is a question of fact." *Brin v. S.E.W. Investors*, 902 A.2d 784, 800–01 (D.C.2006) (alteration in original) (internal quotation marks and citation omitted). Courts determine the accrual of a claim from the moment a party has either "actual notice of her cause of action," or is deemed to be on "inquiry notice" by failing to "act reasonably under the circumstances in investigating matters affecting her affairs," where "such an investigation, if conducted, would have led to actual notice." *Harris v. Ladner*, 828 A.2d 203, 205–06 (D.C.2003) (citation omitted). When the relationship between the fact of injury and the conduct is obscure, the so-called "discovery rule" will apply, such that the claim does not accrue until the claimant knows or by the exercise of reasonable diligence should know of (1) the injury, (2) its cause in fact, and (3) some evidence of wrongdoing. *See Bussineau v. President & Dirs. of Georgetown Coll.*, 518 A.2d 423, 435 (D.C.1986). "[T]he quantum of knowledge sufficient to put one on notice of [his] claims against another" will vary depending on the facts of a case. *Brin, supra,* 902 A.2d at 793; *Fred Ezra Co. v. Psychiatric Inst. of Washington, D.C.*, 687 A.2d 587, 592 (D.C.1996). The limitations period does not run until the claimant has notice of "some evidence of wrongdoing," and its running is not delayed simply because the claimant does not know (or cannot be charged with knowledge of) the full "breadth or nature" of the defendant's wrongdoing. *Brin, supra,* 902 A.2d at 792; *see also Morton v. National Med. Enters., Inc.*, 725 A.2d 462, 468 (D.C.1999) (noting that the "fact that appellants lacked full knowledge of the extent of appellees' alleged wrongdoing" did not preclude accrual of claim). The question turns on when the claimant had "inquiry notice that she might have suffered an actionable injury." *Bussineau, supra,* 518 A.2d at 428 (citation omitted).

 With regard to contract actions, "[a] cause of action for breach of contract accrues, and the statute of limitations begins to run, at the time of the breach." *EastBanc, supra,* 940 A.2d at 1004 (internal citation omitted). *See also Bembery v. District of Columbia*, 758 A.2d 518, 520 (D.C.2000). "A contract is breached if a party fails to perform when performance is due," *EastBanc, supra,* 940 A.2d at 1004, *i.e.*, upon a party's "unjustified failure to perform all or any part of what is promised in a contract entitling the injured party to damages." *Fowler v. A & A Co.*, 262 A.2d 344, 347 (D.C.1970) (internal quotations omitted).

## III. ANALYSIS

### A. *Notice of Hailu's Refusal to Pay*

 Medhin's entitlement to a commission was based on the parties' brokerage contract. The statute of limitations for a contract-based action is three years. *See* D.C.Code § 12–301(7) (2001). It is undisputed that more than three years elapsed between Hailu's refusal to pay Medhin a commission and Hailu's declaratory judgment lawsuit. When Hailu represented to Medhin that he would not pay any commission, Medhin could have sued to enforce his rights under the parties' brokerage agreement. *See News World Communications, Inc. v. Thompsen,* 878 A.2d 1218, 1224–25 (D.C.2005) ("[T]he statute of limitations began to run no later than [the date] Ms. Thompsen had performed her last service to the Times, [and] the Times had declined to compensate her . . ., for by that date she had been definitively told that she would not be paid."); *Pardue v. Center City Consortium Sch. of Archdiocese of Wash., Inc.,* 875 A.2d 669, 679 (D.C.2005) (holding that notice of appellee's "failure to pay . . . gave rise to [appellant's] claim and marked the accrual of her cause of action"); *Bembery, supra,* 758 A.2d at 520 (finding that appellant's making "successive demands and receiv[ing] no payment from the [appellee]" was sufficient for claim to accrue; explicit refusal to pay by appellee was not necessary) (citations omitted). "As a general rule, an actionable claim accrues, and the statute of limitations begins to run, when a suit thereon could first be maintained to a successful conclusion." *Bembery, supra,* 758 A.2d at 520 (citations omitted). Indeed, Medhin's attorney threatened to do just that in April 2004. *See Harris, supra,* 828 A.2d at 206 (finding that "Harris knew of her injury" where she "threatened to sue [appellee] . . . more than three years before she ultimately filed her complaint"). Medhin was well aware that he suffered an injury when he was told "no commission would be paid." Thus, any claim by Medhin to recover that commission brought more than three years after that notice would be untimely. Accordingly, when Hailu sought declaratory judgment over four years later, the trial court did not err in concluding that any claim by Medhin to the commission would have been time-barred.

### B. *The Effect of the Escrow*

 However, Medhin contends that while the funds at issue were being held in an escrow account he did not suffer any injury and therefore the statute of limitations did not begin to run until the trial court granted Hailu access to the escrowed funds.[5] While appellant's argument has some superficial appeal, neither this court nor any other court has held that the mere placement of funds in an escrow account relieves a party seeking those funds of its obligation to file suit within the applicable

---

5. Medhin goes so far as to claim in his brief that the monies in escrow were presumptively his, or held on his behalf, so he had no need to sue to recover them. He cites no authority for his position, however, and we cannot accept it. Rather, we have stated that in a typical "escrow arrangement, the escrow holder is the dual agent of both parties until the performance of the conditions of the escrow agreement," at which time the parties become "entitled" to "those things placed in escrow." *Ferguson v. Caspar,* 359 A.2d 17, 23 (D.C.1976). Medhin provides us with no reason why the escrow here was any different. Moreover, he was not a party to this escrow, and although it was created to hold funds "possibly" owed to him, he disclaims all knowledge of it. Thus, it is a stretch to assume that the monies held pursuant to this escrow presumptively belonged to him, and we make no comment on whether Medhin indeed earned those funds under the brokerage agreement as that issue is not before us.

limitations period. Courts have recognized, however, that under circumstances where a party is led to believe that he or she would ultimately be paid out of the escrow, the escrow can be considered as evidence that a party was unaware that he suffered any injury until after those funds were disbursed. *See, e.g., Coleman Mgmt. v. Meyer*, 304 S.W.3d 340, 349 (Tenn.Ct. App.2009); *see also Bauman v. Centex Corp.*, 611 F.2d 1115, 1119 (5th Cir.1980) (holding that plaintiffs' cause of action did not accrue until the escrow was disbursed where all parties were aware that certain stock was placed in escrow pending a corporate transaction and all could reasonably believe they would eventually be paid upon disbursement despite one party's wrongdoing). However, unlike in those cases, Medhin was well aware of Hailu's decision not to pay him a commission. Therefore, the placement of money into an escrow fund did not affect the running of the statute of limitations on Medhin's claims.

For example, in *Coleman, supra,* which involved a suit between a real estate agent and a seller over the agent's commission, the agent's commission was not paid at the time of closing due to ongoing litigation between the buyer and seller. 304 S.W.3d at 349. In resolving their dispute, the buyer and seller created an agreement to retain funds in escrow that would eventually cover fees and expenses related to their transaction. *Id.* The seller's agent's commission was included in those allotted-for expenses and the seller's agent not only participated in drafting the escrow agreement, but agreed to wait on his commission payment until the funds were ulti-mately disbursed at the close of the escrow. *Id.* at 349–50. However, when the escrow closed and the funds were disbursed, the seller refused to pay the agent his commission and when the agent ultimately sued the seller for his commission, the seller argued that the suit was time-barred. The appellate court held that the agent's claim did not accrue until the funds were disbursed and the seller refused his request because the conversations and circumstances surrounding the creation of the escrow account did not express to the real estate agent that the seller did not intend to perform. *Id.* at 351.

Here, like in *Coleman, supra,* while the escrow account likely was set up to protect the buyer from any claim by Medhin, unlike in *Coleman, supra,* Medhin was told that he would not be paid his commission. Thus, he was not lulled into a false sense of security that he would eventually be paid for his services.[6] To the contrary, Medhin concedes that "[Hailu] refused the commission and [Medhin] gave it to God and left it," until "[Hailu] sued him" over four years later. Because Medhin concedes that he did not know about the funds in the escrow account until he was served with notice of Hailu's suit for declaratory judgment, he could not have been relying on the escrow account to protect his rights.

Without more, the fact that Hailu had placed funds in an escrow account to ensure that the closing on the real estate transaction could go forward does not undermine the trial court's conclusion that Medhin was on notice that he had been

---

**6.** *See, e.g., Bailey v. Greenberg,* 516 A.2d 934, 938 (D.C.1986) (holding that where a party to a contract refuses to pay the other, but later makes affirmative representations that "lull" the other party into foregoing suit until after the three-year period, the statute of limitations will not bar the latter party's suit on the original claim); *see also Jones v. Government Employees Ins. Co.* 621 A.2d 845, 847–48 (D.C.1993) (distinguishing *Bailey* and enforcing statute of limitations where no evidence presented of affirmative representations that "lull" another party into delay).

injured when he was told that he would not be paid his commission. Thus, Medhin sits in the same position as any other party we have found to have slept on his rights after being refused payment under a contract. *See Pardue, supra,* 875 A.2d at 679; *Thompsen, supra,* 878 A.2d at 1224–25; *Bembery, supra,* 758 A.2d at 520. "Statutes of limitations do, after all, exist for a purpose." *Farris v. Compton,* 652 A.2d 49, 57 (D.C.1994) (citing *United States v. Kubrick,* 444 U.S. 111, 117, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979)). To allow Medhin to escape the running of the statute in the face of his concessions would offend the purpose of the statute and its policy favoring repose and disfavoring stale claims.[7] We are therefore satisfied on this record that Medhin could not prove any fact that would cast uncertainty on the otherwise well-supported conclusion that the statute of limitations on any claim he may have had to his commission had run before Hailu's suit. The judgment of the trial court is therefore

*Affirmed.*

---

[7]. We have stated that "[t]he purpose of statutes of limitation is 'to bring repose and to bar efforts to enforce stale claims as to which evidence might be lost or destroyed.'" *Hobson v. District of Columbia,* 686 A.2d 194, 198 (D.C.1996). By precluding stale claims, statutes of limitations not only protect against "major evidentiary problems which can seriously undermine the courts' ability to determine the facts," but also protect[] a potential defendant's "interest in security ... and in planning for the future without the uncertainty inherent in potential liability," and "increase the likelihood that courts will resolve factual issues fairly and accurately." *Farris, supra,* 652 A.2d at 58 & n. 10.