**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,
<u>Plaintiff-Appellant,</u>

v.

No. 99-1860

THE ROMAN CATHOLIC DIOCESE OF
RALEIGH, NORTH CAROLINA; SACRED
HEART CATHEDRAL,
<u>Defendants-Appellees.</u>

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Malcolm J. Howard, District Judge.
(CA-98-978-5-H)

Argued: April 7, 2000

Decided: May 22, 2000

Before WILKINSON, Chief Judge, NIEMEYER, Circuit Judge,
and HAMILTON, Senior Circuit Judge.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Niemeyer and Senior Judge Hamilton joined.

_____

**COUNSEL**

**ARGUED:** Robert John Gregory, Senior Attorney, EQUAL
EMPLOYMENT OPPORTUNITY COMMISSION, Washington,
D.C., for Appellant. Cecil Webster Harrison, Jr., POYNER and

SPRUILL, L.L.P., Raleigh, North Carolina, for Appellees. **ON BRIEF:** C. Gregory Stewart, General Counsel, Philip B. Sklover, Associate General Counsel, Lorraine C. Davis, Assistant General Counsel, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Appellant. Robin Tatum Morris, POYNER and SPRUILL, L.L.P., Raleigh, North Carolina; Charles F. Powers, III, SINK, POWERS, SINK and POTTER, L.L.P., Raleigh, North Carolina, for Appellees.

_____

**OPINION**

WILKINSON, Chief Judge:

The Equal Employment Opportunity Commission (EEOC) brought an enforcement action under Title VII against the Roman Catholic Diocese of Raleigh, North Carolina, and Sacred Heart Cathedral. The EEOC alleged that the church discriminated against Joyce Austin on the basis of her sex through a series of adverse employment actions relating to her positions as the Cathedral's Director of Music Ministry and a part-time music teacher at the Cathedral elementary school. The district court dismissed the action as barred by the First Amendment, holding that the well-recognized ministerial exception to Title VII prohibited the application of the statute to the employment decisions at issue. See EEOC v. Roman Catholic Diocese of Raleigh, 48 F. Supp. 2d 505 (E.D.N.C. 1999). Because Austin's primary duties at the Cathedral and its school consisted of the selection, presentation, and teaching of music, which is integral to the spiritual and pastoral mission of the Catholic Church and many other religious traditions, we affirm the judgment of the district court.

I.

Joyce Austin was hired by Sacred Heart Cathedral in 1983 to be Director of the Cathedral Folk Choir. Austin is a practicing lay Roman Catholic. She holds a Bachelor of Music Education degree from Morningside College in Iowa and a Master of Arts degree in humanities from Hofstra University in New York. She also has vocal and instrumental teaching certificates from the states of New York

2

and North Carolina. Sacred Heart Cathedral is a Roman Catholic church and a constituent part of the Roman Catholic Diocese of Raleigh, which governs the Roman Catholic churches in Eastern North Carolina.

In 1984, Austin began to teach music at the Cathedral elementary school. Her duties as a music teacher included conducting the music program for students in kindergarten through eighth grade, overseeing two extracurricular musical performances each year, assisting in the music preparation for school liturgies, and playing the piano at Mass. In addition, she was responsible for the school choir and the school handbell choir. Her job also required her to serve as a resource person for all musical activities at the school.

In 1990, Father G. L. Lewis, the Rector of the Cathedral at the time, promoted Austin to the newly created position of Director of Music Ministry. This position encompassed both responsibility for music at the Cathedral and teaching music at the Cathedral school. The proposed job description provided that the Director would be, along with the Rector, fully responsible for the Music Ministry of the Cathedral. It stated that the major duties of the position included: "[t]o assist in the planning of all Parish Liturgies; to direct the parish choirs; to teach the congregation to actively and vocally participate in the music of the Parish; to recruit and train cantors." Austin's actual duties were then summarized in a handwritten document agreed to by her and Father Lewis. This document, like the proposed job description, assigned responsibility to Austin for the music program of the Cathedral and the Cathedral school. Among the duties listed were: teaching at the school; supervising and directing choirs; training cantors; and playing for holidays, weddings, and funerals. Austin was also required to approve music for weddings even if she was not available for the ceremonies. She was also made part of the Worship Committee and was required to attend the committee's monthly meetings and participate in seasonal liturgy planning.

In May 1992, Father John Francis O'Connor became Rector of the Cathedral. Austin claims that between September 1992 and February 1995, Father O'Connor reassigned some of Austin's duties to men, two of whom were not Catholic. In February 1995, Austin filed a sex

3

discrimination charge with the EEOC based on the reassignment of these duties to men.

A 1995 parish survey revealed general dissatisfaction with the music program, and the parishioners voiced the need for improvement in the Cathedral's music ministry. On June 2, 1995, Father O'Connor informed Austin that the Director of Music Ministry position was being redesigned and that she would no longer serve in the position as of June 30, 1995. Upon her removal, Austin filed a second charge with the EEOC, alleging that she was terminated because of her sex and in retaliation for her prior charge. Austin continued, however, to serve as a part-time music teacher at the elementary school.

The Cathedral advertised the redesigned music ministry position, which was the full-time position of Director of Music Ministries and Organist. Austin applied for this position, along with forty-two other applicants. The Search Committee reviewed the applications and recommended that Paul Monachino be hired. Father O'Connor ultimately hired Monachino for the position. The church states that Monachino, like Austin, is a practicing Catholic. According to the EEOC, Harry Taylor, a non-Catholic male who assumed Austin's duties in the interim period, was made head of the spiritual choir under Monachino's supervision.

The Cathedral adopted a job description for the Director of Music Ministries and Organist position, who would be "responsible for all music associated with worship" and directly accountable to the Rector. The job description underscored the relationship of music to the spiritual mission of the church. For example, the qualifications for this "liturgical minister" included not only musical experience and skill, but also "an ability to teach, to lead, and to evoke active participation of the people in all liturgical celebrations with their varied and differing musical styles." Underlying all the qualifications was the need for "a thorough understanding of and love for the Liturgy of the Church and the relationship of music to the liturgical life of the Church." The job description also listed two plainly spiritual objectives for the new Director: (1) "To assist in developing a prayerful, singing assembly through preparation, celebration, and evaluation, through education and personal ministry;" and (2)"With the cooperation and assistance of all the parish ministers, the Director of Music

4

Ministries will support the Gospel message through song and challenge the assembly to live it more fully." The Director was to carry out these religious objectives through specific duties such as: recruiting and training parish choirs, cantors, and musicians; implementing new repertoire for the assembly; communicating musical selections to each presider; preparing a weekly worship plan in conjunction with the Parish Liturgy Committee; and incorporating handbells into the work of the choirs.

The EEOC claims that the job description for the new Director's position was quite similar to that for Austin's old Director's position. Further, it states that the new job was defined in practice no differently from the role formerly occupied by Austin. According to the EEOC, the parish priest planned the liturgies, chose the scripture readings without input from Austin, and had the authority to make final decisions concerning the music to be used for religious worship. The EEOC also asserts that despite the written requirement that the new Director be a practicing Catholic, Father O'Connor stated that the position did not have to be filled by a Catholic.

In February 1996, Austin filed a third charge of discrimination and retaliation, challenging the church's decision not to hire her for the new Director's position. In the spring of 1997, Austin was demoted from a "regular part-time" teacher at the school to a "part-time" teacher. According to Austin, she lost sick day and personal day benefits, as well as a tuition reduction for her children at the elementary school, as a result of this decision. In September 1997, Austin filed a fourth EEOC charge, alleging that she was demoted in retaliation for her previous charges.

In December 1998, the EEOC filed suit on Austin's behalf against the Diocese and the Cathedral in the United States District Court for the Eastern District of North Carolina. The EEOC asserted claims of sex discrimination and retaliation under Title VII and 42 U.S.C. § 1981a. These claims encompassed the adverse employment actions about which Austin had complained in her EEOC charges.

The EEOC requested that Austin be awarded compensatory and punitive damages and sought costs for itself. The EEOC also requested far-ranging injunctive relief. It sought a permanent injunc-

tion prohibiting the church "from reassigning the duties of any individual, demoting or failing to rehire any individual due to sex, or any other employment practice which discriminates on the basis of sex, and from retaliating against individuals who oppose discriminatory practices." The EEOC further asked the court to order the church "to institute and carry out policies, practices, and programs which provide equal employment opportunities for women, and which eradicate the effects of its past and present unlawful employment practices."

The church moved to dismiss the complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). In April 1999, the district court granted this motion. The district court held that the ministerial exception to Title VII applied to the employment positions at issue and, accordingly, the First Amendment barred the court from entertaining the EEOC's claims. The EEOC now appeals.

II.

The ministerial exception to Title VII was first articulated in McClure v. Salvation Army, 460 F.2d 553 (5th Cir. 1972), and first recognized by this court in Rayburn v. General Conference of Seventh-Day Adventists, 772 F.2d 1164 (4th Cir. 1985). The ministerial exception operates to exempt from the coverage of various employment laws the employment relationships between religious institutions and their "ministers." See, e.g., Bell v. Presbyterian Church (U.S.A.), 126 F.3d 328, 332-33 (4th Cir. 1997); Dole v. Shenandoah Baptist Church, 899 F.2d 1389, 1396-97 (4th Cir. 1990); Rayburn, 772 F.2d at 1167-69. This constitutionally compelled limitation on civil authority ensures that no branch of secular government trespasses on the most spiritually intimate grounds of a religious community's existence.

Not only is the ministerial exception the well-settled law of this circuit, but it is widely recognized by other courts of appeals. See, e.g., Gellington v. Christian Methodist Episcopal Church , 203 F.3d 1299 (11th Cir. 2000); Bollard v. California Province of the Soc'y of Jesus, 196 F.3d 940 (9th Cir. 1999); Combs v. Central Tex. Annual Conference of the United Methodist Church, 173 F.3d 343 (5th Cir. 1999); EEOC v. Catholic Univ. of Am., 83 F.3d 455 (D.C. Cir. 1996); Young v. Northern Ill. Conference of United Methodist Church, 21 F.3d 184

6

(7th Cir. 1994); Scharon v. St. Luke's Episcopal Presbyterian Hosps., 929 F.2d 360 (8th Cir. 1991).* These courts have repeatedly emphasized the constitutional imperative of governmental non-interference with the ministerial employment decisions of churches.

Moreover, the ministerial exception is rooted in the independence of the spiritual lives of religious bodies in accordance with the dictates of the First Amendment. Indeed, "civil courts have long taken care not to intermeddle in internal ecclesiastical disputes." Bell, 126 F.3d at 330. The Supreme Court has always safeguarded the "unquestioned" prerogative of religious organizations to tend to "the ecclesiastical government of all the individual members, congregations, and officers within the general association." Watson v. Jones, 80 U.S. 679, 728-29 (1871); see also Gonzalez v. Roman Catholic Archbishop of Manila, 280 U.S. 1 (1929). For "religious freedom encompasses the `power [of religious bodies] to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" Serbian Eastern Orthodox Diocese for the United

_____

*All circuits to have addressed the question have recognized the continuing vitality of the exception after the Supreme Court's decision in Employment Div., Dep't of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990). See Gellington v. Christian Methodist Episcopal Church, 203 F.3d 1299, 1302-04 (11th Cir. 2000); Combs v. Central Tex. Annual Conference of the United Methodist Church, 173 F.3d 343, 347-50 (5th Cir. 1999); EEOC v. Catholic Univ. of Am., 83 F.3d 455, 461-63 (D.C. Cir. 1996). The D.C. Circuit in Catholic Univ. found that the ministerial exception survived Smith principally for two reasons: "First, the burden on free exercise that is addressed by the ministerial exception is of a fundamentally different character from that at issue in Smith and in the cases cited by the Court in support of its holding. . . . Second, [cases invoking the ministerial exception] rely on a long line of Supreme Court cases that affirm the fundamental right of churches to `decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine' . . . [and] we cannot believe that the Supreme Court in Smith intended to qualify th[e] century-old affirmation of a church's sovereignty over its own affairs." 83 F.3d at 462, 463 (quoting Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 116 (1952)). We agree with this view, and indeed our own circuit has invoked the ministerial exception after Smith. See Bell, 126 F.3d 328. In fact, the EEOC does not advance any abrogation argument on this appeal.

States of America and Canada v. Milivojevich, 426 U.S. 696, 721-22 (1976) (alteration in original) (quoting Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 116 (1952)). "In short, the First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government . . . ." Serbian Eastern Orthodox Diocese, 426 U.S. at 724.

While the ministerial exception promotes the most cherished principles of religious liberty, its contours are not unlimited and its application in a given case requires a fact-specific inquiry. The ministerial exception does not insulate wholesale the religious employer from the operation of federal anti-discrimination statutes. See Rayburn, 772 F.2d at 1171-72; see also Bollard, 196 F.3d at 947 ("[T]he scope of the ministerial exception to Title VII is limited to what is necessary to comply with the First Amendment."). For instance, the exception would not apply to employment decisions concerning purely custodial or administrative personnel. Rather, the exception shelters certain employment decisions from the scrutiny of civil authorities so as to preserve the independence of religious institutions in performing their spiritual functions. Where no spiritual function is involved, the First Amendment does not stay the application of a generally applicable law such as Title VII to the religious employer unless Congress so provides. See Rayburn, 772 F.2d at 1171.

Our inquiry thus focuses on "the function of the position" at issue and not on categorical notions of who is or is not a"minister." Id. at 1168. For example, we have expressly rejected any view that ordination is a prerequisite to the application of the exception, see id. at 1168-69, and courts have routinely applied the exception in cases involving persons other than ordained ministers. See, e.g., Starkman v. Evans, 198 F.3d 173 (5th Cir. 1999) (lay choir director); Catholic Univ., 83 F.3d 455 (member of university canon law faculty); Rayburn, 772 F.2d 1164 (non-ordained associate in pastoral care); EEOC v. Southwestern Baptist Theological Seminary, 651 F.2d 277 (5th Cir. 1981) (faculty of seminary). The general rule is that "if the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship, he or she should be considered clergy." Rayburn, 772 F.2d at 1169 (internal quotation marks omitted). A court must therefore "determine whether a position is impor-

8

tant to the spiritual and pastoral mission of the church" in order to decide whether the ministerial exception applies. Id.

Though its range of application is limited to spiritual functions, the ministerial exception to Title VII is robust where it applies. This protection is in keeping with the "spirit of freedom for religious organizations [and] independence from secular control or manipulation" reflected in the Supreme Court's free exercise jurisprudence. Kedroff, 344 U.S. at 116. The exception precludes any inquiry whatsoever into the reasons behind a church's ministerial employment decision. The church need not, for example, proffer any religious justification for its decision, for the Free Exercise Clause "protects the act of a decision rather than a motivation behind it." Rayburn , 772 F.2d at 1169.

Of course, the existence of the ministerial exception does not derogate the profound state interest in "assuring equal employment opportunities for all, regardless of race, sex, or national origin." Id. at 1168. Rather, the exception simply recognizes that the"introduction of government standards to the selection of spiritual leaders would significantly, and perniciously, rearrange the relationship between church and state." Id. at 1169. Application of the exception thus manifests no more than the reality that a constitutional command cannot yield to even the noblest and most exigent of statutory mandates.

III.

This appeal is characterized first by a broad stretch of agreement between the parties. Both parties accept the validity of the ministerial exception. The parties also agree that the exception has not been limited to cases involving ordained ministers or priests, but rather requires a fact-specific examination of the function of the position.

The litigants part company, however, on the narrow question of whether the particular employment positions at issue fall within the ministerial exception. The EEOC argues that the positions were not essentially religious in nature. It claims that Austin's job functions as Director of Music Ministry and as a part-time music teacher were instead "primarily secular." In its view, Austin's positions cannot be considered ministerial because she was merely "a lay choir director

9

and teacher, charged with the responsibility of training people to sing and perform music."

We disagree. The music ministry and teaching positions at issue are ministerial because the positions are "important to the spiritual and pastoral mission" of the church. Rayburn , 772 F.2d at 1169. The functions of the positions are bound up in the selection, presentation, and teaching of music, which is an integral part of Catholic worship and belief. The Free Exercise Clause therefore bars consideration of the instant employment discrimination claims. To hold otherwise would require us to say that music is substantially devoid of spiritual significance in the life of the church. Such a view cannot stand in light of the role of religious music in worship and the record in this case.

At the heart of this case is the undeniable fact that music is a vital means of expressing and celebrating those beliefs which a religious community holds most sacred. Music is an integral part of many different religious traditions. See generally Enchanting Powers: Music in the World's Religions (Lawrence E. Sullivan ed., 1997). It serves a unique function in worship by virtue of its capacity to uplift the spirit and manifest the relationship between the individual or congregation and the Almighty. Indeed, the church has presented ample undisputed evidence affirming the centrality of sacred music to the Catholic faith and the importance of music ministry to the faith community. For example, Father Michael Clay, a Catholic priest who holds graduate degrees in liturgical music and theology, stated in his affidavit that music "helps the faithful to be more easily moved to devotion and better disposed to receive grace from God."

Thus, inasmuch as Austin's duties involve the expression of the church's musical tradition, it is a fallacy to denominate them as merely secular. We refuse to demote music below other liturgical forms or to sever it from its spiritual moorings. We cannot say, for example, that the reading of scripture or the reciting of prayers is any more integral to religious worship than the singing of hymns or the intonation of chants. Whether spoken or sung, psalms lift eyes unto the hills. It is not for us to place the oratorios of Handel, the cantatas of Bach, or the simplest of hymns beneath the reading of the sacred texts from which they draw. The Songs of the Confucian Sacrificial

10

Ceremony, the gamelan music of Javanese mysticism, and the ballads of Sephardic song can be every bit as spiritually intimate as spoken prayers. We cannot deny free exercise protection to the former any more than we can to the latter. Nor can we privilege modes of religious expression that draw principally from the rational faculties, such as preaching or the teaching of theology, over those which summon the more lyrical elements of the human spirit. Indeed, "the inspirational appeal of religion in the[ ] guises [of music, architecture, and painting] is often stronger than in forthright sermon." Illinois ex rel. McCollum v. Board of Educ., 333 U.S. 203, 236 (1948) (Jackson, J., concurring). The efforts of a music minister or teacher can thus influence the spiritual and pastoral mission of the church as much as one who would lead the congregation in prayer, preach from the pulpit, or teach theology in school.

Austin was clearly a pivotal figure in most, if not all, aspects of the musical life of the Cathedral and school. The various job descriptions for the music ministry positions, though not dispositive, unmistakably evince the religious significance of her music ministry. Austin was required to assist in the planning of liturgies and was in charge of the parish choirs -- functions at the very heart of the church's musical life. The positions also entailed responsibility for recruiting choir members, cantors, and special musicians. The job description for the new music ministry position sought by Austin -- which Austin claims was essentially the same as her own job description-- emphasized that this "liturgical minister" must "assist in developing a prayerful, singing assembly" and "support the Gospel message through song and challenge the assembly to live it more fully." The description also conferred upon the Director of Music Ministries responsibility "for all music associated with worship" and detailed a number of duties relating to the selection and presentation of liturgical music.

The significance of Austin's role in the selection and presentation of religious music is highlighted by the interplay between music and other liturgical forms. The music at religious worship services is often tied to the seasons of the church year or the day's scripture readings. Indeed, Father O'Connor stated in his affidavit that Austin's role at the three weekly worship services was "to choose music that reflected and enhanced the theme of the Scriptures of the day and that would assist the assembly of believers in their individual journeys of faith."

11

Father O'Connor also stated that Austin was involved in planning music for the special seasons of the year, such as Christmas and Easter, and for special feast days such as the Feast of Christ the King and the Feast of Pentecost. And even where Austin did not select the music herself, the subtle judgments that accompany the presentation and interpretation of sacred music contribute to its spiritual effect.

Austin also served as a representative of the church to the congregation. She played a prominent role in worship services and helped to lead the congregation in song. The significance of her role was reinforced by the fact that Austin was listed on the front page of the Parish bulletin under "Parish Staff," along with the parish priests and a Pastoral Associate/Director of Religious Education. Austin was thus a visible (and audible) sign of the church's work through music, as well as a leader of the congregation in the church's musical, and therefore spiritual, life.

The EEOC attempts, however, to downplay Austin's role in the liturgy. It makes much of the fact that Austin was answerable to the Rector of the Cathedral, who had the ultimate say over the music to be played at worship. Yet the EEOC does not deny that Austin played a major role in the presentation of music to the congregation. Further, there is no requirement that an individual have the"final say" on spiritual matters before the ministerial exception can be applied. While the exercise of "religious discretion" of this variety may be considered in determining whether a position is ministerial, it is not talismanic. Rather, it is enough that Austin's "primary duties consist of teaching, spreading the faith, . . . or supervision or participation in religious ritual and worship." Rayburn, 772 F.2d at 1169.

Nor does the EEOC's contention that the occupants of the music ministry positions were not required to be Catholic diminish the spiritual significance of the music ministry role. Church documents, the relevant job descriptions, and Father O'Connor's affidavit reveal that religious criteria were significant in the hiring decision apart from the religious affiliation of the minister. For example, Church documents state that "the pastoral musician . . . is a minister, someone who shares faith, serves the community, and expresses the love of God and neighbor through music." Bishops' Committee on the Liturgy, Liturgical Music Today para. 64 (1982). And the job description for the new

12

Director of Music Ministries position stated that the individual selected "must bring to the position a thorough understanding of and love for the Liturgy of the Church and the relationship of music to the liturgical life of the Church." There is no reason to believe that such criteria were not important in practice as well. Father O'Connor himself stated that he chose the new Director of Music Ministries based on who he believed "could best accomplish the spiritual and pastoral functions of that position and who, through leading the musical praise, could challenge and promote the spiritual good of the assembly."

The EEOC also suggests that the religious significance of the hiring decision is somehow diluted by Father O'Connor's statement that the individual selected "must have the knowledge and ability to function in the position." But the record is clear that the required "knowledge and ability" transcended merely secular matters. For example, Church documents speak of the act of music ministry as a "threefold judgment": (1) musical, (2) liturgical, and (3) pastoral. See Bishops' Committee on the Liturgy, Music in Catholic Worship 15-19 (2d ed. 1983). Indeed, it is not easy to divorce even the more technical aspects of music from its significance in religious worship. Whether a selection is played adagio or andante can have a profound effect on the religious worship and vocal participation of the congregation. And different performances of the same musical piece can evoke different responses.

We are thus faced with more than the "generalized and diffuse concern for church autonomy" that is insufficient to trigger First Amendment protection from the operation of secular laws. Bollard, 196 F.3d at 948. Rather, the role of the music minister "is so significant in the expression and realization of [the church's] beliefs that state intervention in the appointment process would excessively inhibit religious liberty." Rayburn, 772 F.2d at 1168. Put another way, Austin was the primary human vessel through whom the church chose to spread its message in song. Employment decisions concerning her music ministry thus relate to "how and by whom [churches] spread their message." Bell, 126 F.3d at 332. These decisions lie accordingly beyond judicial competence. See id. at 332-33.

The Fifth Circuit's application of the ministerial exception to a music ministry position in Starkman is instructive. 198 F.3d 173. The

13

Starkman court held that the First Amendment barred the employment discrimination claims of a lay choir director. A number of factors underlying the decision in that case are present here as well. For instance, Starkman's job description entailed responsibility for planning, recruitment, and implementation in all aspects of the church's music ministry. See id. at 176. Starkman was required to plan worship liturgy, conduct choirs, and hire other musical personnel. See id. Further, the court found it undisputed that "religious music plays a highly important role in the spiritual mission of the church" and that "music constitutes a form of prayer that is an integral part of worship services and Scripture readings." Id. at 176, 177.

The integral role of music in the spiritual life of the church underlies the application of the ministerial exception to the music teaching position as well. The Supreme Court has recognized generally the "critical and unique role of the teacher in fulfilling the mission of a church-operated school." NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 501 (1979). The particular teaching position in this case is of especial significance to the school's religious mission because it revolves around music. It is thereby bound up in the undeniable religious meaning of music in the life of the church in this case.

Indeed, Austin's duties at the Cathedral school appear to have gone far beyond the teaching of music classes. As Austin herself points out in exhibits attached to her affidavit, she was responsible for the music program of the school and served as a resource person for all musical activities in the school. She also assisted in the music preparation for school liturgies and played the piano at Mass. Austin was responsible for the school choir and school handbell choir. These duties, coupled with the spiritual significance of her teaching role, render her position at the Cathedral school "ministerial" for purposes of the exception.

IV.

"[D]etermination of whose voice speaks for the church is per se a religious matter." Minker v. Baltimore Annual Conference of the United Methodist Church, 894 F.2d 1354, 1356 (D.C. Cir. 1990) (internal quotation marks omitted). This is no less true when the voice that speaks is the voice of song. The functions of the music ministry and music teaching positions in this case are integral to the spiritual

14

and pastoral mission of Sacred Heart Cathedral. We are thus confronted with a case involving ecclesiastical decisions that the Free Exercise Clause of the First Amendment places "beyond the ken of civil courts." <u>Bell</u>, 126 F.3d at 331. Accordingly, we affirm the judgment of the district court.

<u>AFFIRMED</u>

15