# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00389-CV

**Ken Patton, Appellant**

**v.**

**Bobbie Kaye Jones, Individually; Barbara Ruth, Individually; John Wright, Individually; St. John's United Methodist Church; Oak Hill United Methodist Church; The Austin District of the United Methodist Church; and Southwest Texas Conference of the United Methodist Church, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT NO. GN304244, HONORABLE C. W. DUNCAN, JR., JUDGE PRESIDING

## O P I N I O N

Appellant Ken Patton urges that the trial court erred in dismissing his case for a lack of subject matter jurisdiction because the First Amendment's ecclesiastical abstention doctrine, also referred to as the ministerial exception, does not bar judicial review of his claims for defamation and tortious interference with an employment contract. Appellees, Pastor Bobbie Kaye Jones, Pastor Barbara Ruth, Pastor John Wright, St. John's United Methodist Church, Oak Hill United Methodist Church, The Austin District of the United Methodist Church, and the Southwest Texas Conference of the United Methodist Church (collectively, "The Church") respond that because Patton, as the Director of Youth Ministries for the Oak Hill United Methodist Church, was employed in a ministerial role, the Free Exercise Clause prohibits judicial review of the Church's actions and

communications leading to Patton's termination. We will affirm in part and reverse and remand in part.

## STANDARD OF REVIEW

A motion to dismiss based on a lack of subject matter jurisdiction is functionally equivalent to a plea to the jurisdiction challenging the trial court's authority to determine the subject matter of a cause of action. *Lacy v. Bassett*, 132 S.W.3d 119, 122 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (discussing dismissal based on ecclesiastical doctrine) (citing *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000)). We review the record *de novo* to determine whether the trial court had subject matter jurisdiction. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998). We consider only the evidence pertinent to the jurisdictional inquiry and do not weigh the merits. *County of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002). Also, we construe the pleadings in favor of the plaintiff, accepting all his allegations as true. *Bland Indep. Sch. Dist.*, 34 S.W.3d at 555. To prevail, the defense must show that, even accepting all of the plaintiff's allegations as true, an incurable jurisdictional defect remains on the face of the pleadings that deprives the trial court of subject matter jurisdiction. *Brenham Hous. Auth. v. Davies*, 158 S.W.3d 53, 56 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

Construing the allegations in Patton's pleadings as true, and considering the uncontested evidence, we find the following undisputed facts in the record.[1]

---

[1] The only evidence in the record was offered by Patton, consisting of his affidavit, a copy of handwritten notes used in the Church's meeting about Patton's employment, and a letter from the chairwoman of the parish committee that decided to terminate Patton. At the hearing on the motion to dismiss, no testimony was offered; only argument by counsel was presented.

## BACKGROUND

Patton was employed by Oak Hill United Methodist Church as the Director of Youth Ministries from April 2002 until October 31, 2002.[2] In that position, Patton was responsible for "the administration and organizing of recreational events for the youth, such as camping outings and other social gatherings. . . . [Patton] coordinated the transportation, . . . oversaw the logistics, . . . [and] served as a chaperone." He also "managed the budget for the youth program, recruited [adult and youth] participants, registered the attendees at events, [] collected participation fees from attendees, [and] performed fundraising duties." As Director of Youth Ministries, Patton did not participate in worship services or ceremonies, had no responsibility for the music or liturgy, did not assist with the confirmation of youth, and was not required to teach religious classes or have religious training.

On October 24, 2002, appellee Jones (a Pastor at St. John's) discussed with appellee Wright (an Associate Pastor at Oak Hill) whether Patton should be terminated from Oak Hill. According to handwritten notes taken by Pastor Wright, Pastor Jones told him about allegations that Patton had upset congregation members by dating certain women and by putting his arm around girls at church. Pastor Jones also described a rumor that Patton had used internet pornography as being "unsolicited, anecdotal, [and] unsubstantiated." Patton contends that each of the rumors are false.

After this conversation, Pastor Wright relayed these rumors to appellee Ruth (a Pastor at Oak Hill). Pastor Ruth then met with the Staff Parish Relations Committee ("SPRC") and

---

[2] Patton had previously served as the Interim Director of Youth at St. John's United Methodist Church from August to December 2001.

recommended that Patton be terminated from his position as Oak Hill's Director of Youth Ministries. Pastor Wright informed Patton of the decision. Shortly beforehand, Patton had discovered Pastor Wright's handwritten notes laying on the church photocopy machine.

In a subsequent letter to two concerned members of the congregation, the committee chairwoman[3] wrote,

> Please know that this committee and your pastors share your concern for the youth program. . . . A search for a new youth director will begin after the first of the year . . . . Before any action was taken, the Pastors discussed the situation with the District Superintendent and sought the backing of the SPRC, . . . [which] unanimously voted to accept the recommendation to support the decision reached by [Jones], [Wright], and myself. . . . I can assure you that [we] approached this decision prayerfully and in the best interests of the church. . . .

Patton also alleged that the chairwoman told a member of the congregation who asked about Patton's termination that, "It is really bad" and "We had to get him out before something happened at our church," and that Pastor Ruth responded to a member's question by stating, "[Patton] knows why he was fired" and "he wouldn't want anyone else to know."

Patton sued the Church, claiming it was liable for defamation and tortious interference with an employment contract. The Church defendants filed a joint motion to dismiss, which was granted by the trial court. This appeal followed. The sole question presented on appeal is whether, based on First Amendment principles, the trial court correctly determined that it lacked subject matter jurisdiction.

---

[3] Patton did not sue the chairwoman in her individual capacity but instead named the Conference, asserting that the chairwoman acted as its agent.

**ANALYSIS**

*Free Exercise Clause*

The First Amendment provides in relevant part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. The Establishment and Free Exercise Clauses apply to the states by incorporation through the Fourteenth Amendment. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 8 (2004).

The Supreme Court interpreted the basis of the Free Exercise Clause at issue here in *Watson v. Jones*, 80 U.S. 679, 728-33 (1872). In often-quoted language, the Court held that "civil courts exercise no jurisdiction . . . where a subject-matter of dispute [is] strictly and purely ecclesiastical in its character," such as disputes "concern[ing] theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required." *Id*. at 733. Instead, civil courts are to accept "as final, and as binding on them" the decisions of an ecclesiastical institution on such matters. *Id*. at 728. "[I]t would be of vain consent," the Court held, "if anyone aggrieved by one of [an ecclesiastical institution's] decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance." *Id*. at 730. In part, this is because ecclesiastical institutions "are the best judges of what constitutes an offense against the word of God" and "of matters of faith, discipline, and doctrine; and civil courts, if they should be so unwise to attempt to [decide such matters], would only involve themselves in a sea of uncertainty and doubt." *Id*. at 732 (citations omitted).

5

In the 135 years since *Watson*, many courts have applied these principles—often referred to as the "ecclesiastical abstention doctrine" or the "ministerial exception"—to cases concerning employment decisions by religious institutions.[4] These cases have consistently held that civil courts lack subject matter jurisdiction to decide such controversies if the employment decision concerns a member of the clergy or an employee in a ministerial position. *See*, *e.g.*, *Starkman v. Evans*, 198 F.3d 173, 176 (5th Cir. 1999); *Green v. United Pentecostal Church Int'l*, 899 S.W.2d 28, 30 (Tex. App.—Austin 1995, pet. denied).[5]

The "ecclesiastical abstention doctrine" provides a broader analysis that encompasses the "ministerial exception." The ecclesiastical abstention doctrine prevents secular courts from reviewing many types of disputes that would require an analysis of "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required." *Watson*, 80 U.S. at 733.[6] In cases relying on the ecclesiastical abstention

---

[4] Because these constitutional concepts have been discussed more extensively by the federal courts, although not binding, we will look to the federal opinions that are "logically persuasive and well-reasoned" for guidance. *See Davenport v. Garcia*, 834 S.W.2d 4, n.53 (Tex. 1992); *see also Bell v. Low Income Women of Tex.*, 95 S.W.3d 253, 266 (Tex. 2002).

[5] Although the First Amendment prohibits civil courts from exercising jurisdiction over purely ecclesiastical matters involved in church-related disputes, the First Amendment does not forbid civil courts from adjudicating property rights of the church or its members, so long as such rights can be determined by the application of "neutral principles of law." *Jones v. Wolf*, 443 U.S. 595, 602-04 (1979); *Hutchinson v. Thomas*, 789 F.2d 392, 396 (6th Cir. 1986); *Voice of Cornerstone Church Corp. v. Pizza Prop. Partners*, 160 S.W.3d 657, 671-73 (Tex. App.—Austin 2005, no pet.); *Dean v. Alford*, 994 S.W.2d 392, 395 (Tex. App.—Fort Worth 1999, no pet.).

[6] *See*, *e.g.*, *Lacy v. Bassett*, 132 S.W.3d 119, 124-25 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (doctrine used to resolve issue of whether congregation member had right to access church financial records, not involving employment decision); *Nussbaumer v. Florida*, 882 So. 2d 1067, 1077 (Fla. Dist. Ct. App. 2004) (doctrine applied in context of clergy communications privilege).

doctrine, courts consider the substance and nature of the plaintiff's claims to determine whether the First Amendment prevents subject matter jurisdiction. *See*, *e.g.*, *Williams v. Gleason*, 26 S.W.3d 54, 58-60 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

More narrowly, if the claim challenges a religious institution's employment decision, the sole jurisdictional inquiry is whether the employee is a member of the clergy or otherwise serves a "ministerial" function. *See Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698, 703-04 (7th Cir. 2003) (declining to consider whether substance of claim was secular in nature because only relevant question was characterization of job function). If the employee is a minister, then the "ministerial exception" applies, preventing secular review of the employment decision without further question as to whether the claims are ecclesiastical in nature. *See Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1167-68 (4th Cir. 1985); s*ee also Combs v. Central Tex. Annual Conference of the United Methodist Church*, 173 F.3d 343, 350 (5th Cir. 1999) (employment claims by ministers "necessarily intrude into church governance in a manner that would be inherently coercive, even if the alleg[ations] [] were purely nondoctrinal"); *Abrams v. Watchtower Bible & Tract Soc'y*, 715 N.E.2d 798, 803 (Ill. App. 1999) (review of ecclesiastical decisions, "particularly those pertaining to the membership or hiring and firing of clergy, are in themselves an 'extensive inquiry' into religious law and practice, and therefore, forbidden by the First Amendment"). The reason for this special rule for employment decisions about ministers is because

> [t]he relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose.

7

> Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern. . . .
>
> [Inquiry into a church's decision regarding the] employment relationship existing between [] a church and its minister would result in an encroachment by the State into an area of religious freedom which it is forbidden to enter by the principles of the free exercise clause of the First Amendment.

*McClure v. Salvation Army*, 460 F.2d 553, 558-60 (5th Cir. 1972) (establishing ministerial exception based on general principle espoused in *Watson*, 80 U.S. at 733, that secular courts lack subject matter jurisdiction to review ecclesiastical matters).

Thus, in resolving whether the trial court had subject matter jurisdiction over Patton's claims, we will first address whether Patton's job function was "ministerial." If so, then pursuant to the ministerial exception, Patton's claims for defamation and tortious interference are not subject to secular review, to the extent that they are connected to the church's decision to terminate his employment. However, portions of his claims that are not connected to the employment decision are not necessarily barred from review by the First Amendment.

### Whether Patton's Job was "Ministerial"

Whether an employee of a religious institution is a "minister" is a question of law for the court. *Starkman*, 198 F.3d at 176. The ministerial exception has not been limited to members of the clergy. *Rayburn*, 772 F.2d at 1169. Rather, it "encompasses all employees of a religious institution, whether ordained or not, whose primary functions serve its spiritual and pastoral mission." *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 463 (D.C. Cir. 1996). An employee's job title is not dispositive. *Alicea-Hernandez*, 320 F.3d at 704 n.4. Instead, we must consider the

8

realities of the "function of the position at issue" to determine whether the position is ministerial in nature. *EEOC v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795, 801 (4th Cir. 2000). "As a general rule," an employee's position will be considered "ministerial" if his or her "primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship" or if the "position is important to the spiritual and pastoral mission of the church." *Rayburn*, 772 F.2d at 1169. However, the "exception would not apply to employment decisions concerning purely custodial or administrative personnel . . . [w]here no spiritual function is involved." *Roman Catholic Diocese*, 213 F.3d at 801.

The Fifth Circuit articulated a three-part test in *Starkman v. Evans* to determine whether an employee's primary duties are ministerial in nature: (1) "whether employment decisions regarding the position at issue are made 'largely on religious criteria,'" (2) "whether the plaintiff was qualified and authorized to perform the ceremonies of the Church," and (3) "probably most important is whether [plaintiff] 'engaged in activities traditionally considered ecclesiastical or religious.'" 198 F.3d at 176-77 (citations omitted). The *Starkman* court held that it is "sufficient" to deem an employee's function "ministerial" if only the third prong is satisfied. *Id*. at 177 (choir director was minister because religious "music constitutes a form of prayer that is an integral part of worship").

Many courts have analyzed whether a particular employee qualifies as a "minister" using the general standards set forth in *Rayburn* and the "primary duties" test articulated in *Starkman*. The parties have not cited, nor have we found, any case presenting the exact question here—whether a Director of Youth Ministries, who does not preach or teach but instead administers

9

and oversees the church's youth-group activities and fundraising, holds a "ministerial" position. Thus, we review the types of employees who have and have not been deemed "ministers" in other cases.[7]

We find particularly instructive the cases involving positions that are partly administrative in nature and do not require the employee to participate in worship activities or to teach religious doctrine (unlike positions traditionally considered "ministerial," such as reverends,

---

[7] *See*, *e.g.*, *EEOC v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795, 801 (4th Cir. 2000) (Director of Music Ministry was minister because "music is a vital means of expressing" religious beliefs and employee was a "visible . . . leader of the congregation"); *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 457 (D.C. Cir. 1996) (nun was "functional equivalent of a minister"); *Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1165, 1169 (4th Cir. 1985) ("associate in pastoral care intern" was minister because position involved "evangelical, liturgical, and counseling responsibilities"); *Smith v. Raleigh Dist. of N.C. Conference of the United Methodist Church*, 63 F. Supp. 2d 694, 706 (E.D.N.C. 1999) (church receptionist and secretary were "secular, lay employees who performed non-religious, administrative tasks); *Shirkey v. Eastwind Cmty. Dev. Corp.*, 941 F. Supp. 567, 577 (D. Md. 1996) ("community developer" for non-profit Methodist group was not minister because tasks of developing economy, reducing unemployment, and improving quality of life in community were secular in nature); *Turner v. Church of Jesus Christ of Latter-Day Saints*, 18 S.W.3d 877, 889-96 (Tex. App.—Dallas 2000, pet. denied) ("missionary" was minister because essential tasks were to preach gospel and perform baptisms); *Dean*, 994 S.W.2d at 395 (Baptist pastor was minister); *Tran v. Fiorenza*, 934 S.W.2d 740, 744 (Tex. App.—Houston [1st Dist.] 1996, no pet.) (Catholic priest was minister); *Green v. United Pentecostal Church Int'l*, 899 S.W.2d 28, 30 (Tex. App.—Austin 1995, pet. denied) (Pentecostal reverend was minister); *see also Weissman v. Congregation Shaare Emeth*, 839 F. Supp. 680, 682 (E.D. Mo. 1993) (claims by Temple Administrator, whose position was both secular and religious, were barred from review by First Amendment because would require review of ecclesiastical matters); *Williams v. Gleason*, 26 S.W.3d 54, 59-60 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (church's discipline of Sunday-school teacher was ecclesiastical matter); *Patterson v. Southwest Baptist Theological Seminary*, 858 S.W.2d 602, 605 (Tex. App.—Fort Worth 1993, no writ) (seminary's termination of theology professor was ecclesiastical matter).

priests, nuns, missionaries, and the like). In *Alicea-Hernandez v. Catholic Bishop of Chicago*, the Hispanic Communications Manager for the Catholic church was responsible for "press secretary" duties including: composing media releases, correspondence, and church publications; developing relationships with the Hispanic media and community; and translating church materials into Spanish. 320 F.3d at 703-04. Her duties did not include participating in worship activities or religious teaching. *Id*. Although Alicea-Hernandez's duties were facially administrative, the Seventh Circuit concluded her position was ministerial in nature because, ultimately, her role was critical in disseminating the church's message, and the "[d]etermination of whose voice speaks for the church is *per se* a religious matter." *Id*. at 704 (citations omitted).

Similarly, in *Pardue v. Center City Consortium Schools of the Archdiocese of Washington, Inc.*, the principal of a Catholic school was deemed a "minister," although she claimed to function only in an administrative capacity and was not responsible for leading any worship activities or teaching religious classes. 875 A.2d 669, 677 (D.C. App. 2005). The court held that, as "chief administrator . . . she would certainly be expected to perform numerous duties—secular in appearance—designed to meet public licensing requirements and to maintain the standing of the institution as a school. But she was also . . . answerable to the religious authorities for providing, in a myriad of ways not reducible to a listing of tasks, 'spiritual leadership in and for the school community.'" *Id*.; *see also Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 309 (4th Circ. 2004) ("mashgiach," who was responsible for maintaining kosher kitchen, was minister "given the importance of dietary laws to the Jewish religion").

11

Patton's position as Director of Youth Ministries undoubtedly included several administrative duties, such as coordinating the transportation, logistics, and other travel arrangements for youth outings and gatherings. Yet, by his own testimony, Patton was responsible for "organizing" these events, meaning that he made decisions on behalf of the church about what activities the members of its youth ministry would participate in. The purpose of a church organizing a youth-group retreat is to bring people together in fellowship, often coupled with religious worship or reflection. Even if Patton was not teaching the doctrine himself, he testified that he was actively participating as a chaperone. Organizing and chaperoning these events for the youth ministry are activities that furthered the church's mission, which went beyond purely secular tasks such as booking a chartered bus, collecting payments from the participants, or reserving cabins for a retreat. Furthermore, Patton averred that he "managed the budget for the youth program." Had Patton been responsible merely for accounting, this function might be viewed as solely secular because he would not have any discretion over the use of church funds. But, as the director of the program who "managed" the budget, Patton was authorized to decide how the church's money was best used in furtherance of ministering to its youth. Because Patton was responsible for deciding what activities the church's youth group would participate in and how the program's money would be spent, he was "answerable to the religious authorities for providing, in a myriad of ways not reducible to a listing of tasks, 'spiritual leadership in and for the [youth ministry].'" *See Pardue*, 875 A.2d at 677.

Notably, Patton's affidavit also states that he "performed fundraising duties" and "recruited participants" for the program. There is no question that asking people to give their time and money to support activities of the youth ministry is a function that is "important to the spiritual

12

and pastoral mission of the church," especially in light of the fact that Patton was also responsible for deciding how to use that money and how to organize those events. *See Rayburn*, 772 F.2d at 1169. In fulfilling these duties, Patton would be directly communicating the mission of the program to individuals and encouraging them to participate either financially or physically.

Thus, even accepting Patton's allegations as true, it is apparent on the face of his pleadings that he was acting both as the "voice" of the youth ministry and serving as a "primary agent" of the church. *See Davies*, 158 S.W.3d at 56. "Determin[ing] whose voice speaks for the church is *per se* a religious matter," *Alicea-Hernandez*, 320 F.3d at 704, and determining who will serve as a "primary agent by which a church seeks to fulfil its purpose" is precisely the type of ecclesiastical decision that the First Amendment intends to protect. *Dean v. Alford*, 994 S.W.2d 392, 395 (Tex. App.—Fort Worth 1999, no pet.); *see also Watson*, 80 U.S. at 733. Considering the *Starkman* "primary duties" test, then, (1) the church's employment decision regarding Patton's position would be based 'largely on religious criteria,' and (2) Patton's organizing of, as well as his budgeting, fundraising, and recruiting participants for youth ministry activities are things "traditionally considered [to serve an] ecclesiastical or religious" purpose. *See* 198 F.3d at 176-77.[8] Accordingly we hold that, as Director of the Youth Ministry for the United Methodist church, Patton functioned in a ministerial capacity.

---

[8] Although the record does not demonstrate that Patton was "qualified and authorized to perform the ceremonies of the Church," there is no requirement that all three *Starkman* factors be satisfied to determine that an employee's primary duties are ministerial.

***Whether Dismissal of Claims was Proper***

Because "churches must be free to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine," the actions taken and the communications made by the Church as part of its employment decision about Patton's ministerial position are ecclesiastical matters protected from secular review by the Free Exercise Clause. *See Combs*, 173 F.3d at 350 (quoting *McClure*, 460 F.2d at 560); *Rayburn*, 772 F.2d at 1169. Thus, the trial court was correct to dismiss for a lack of subject matter jurisdiction Patton's claims for (1) tortious interference with his employment contract and (2) defamation, to the extent that it was based on statements made in furtherance of the Church's decision to terminate Patton.

However, Patton also alleged as defamatory the chairwoman's letter to concerned parishioners, as well as the chairwoman's and Pastor Ruth's answers to questions from members of the congregation. Because these statements were made after the Church's employment decision was final, they cannot be said to have been made in furtherance of the Church's decision.

We find *Drevlow v. Lutheran Church* instructive on this issue. In *Drevlow*, a pastor's challenge to his church's decision to remove his name from the list of eligible ministers was an ecclesiastical matter shielded from secular review. 991 F.2d 468, 471 (8th Cir. 1993). His claim for defamation, however, was viable for judicial review because it was not connected to the church's determination about "his fitness as a minister." *Id*. at 471-72. Consequently, the appellate court reversed that portion of the lower court's dismissal and remanded it to provide Drevlow "an opportunity to prove his secular allegations at trial." *Id*. at 472. In so doing, the appellate court noted that it was unable to predict what evidence would arise and, therefore, cautioned the lower

14

court on remand to "limit the evidence at trial in order to avoid determining religious controversies." *Id*. at 471-72.

Similarly, we are guided by *Turner v. Church of Jesus Christ of Latter-Day Saints*, in which all of the minister's employment-related claims were deemed "ecclesiastical matters" protected from review, but his defamation claim was not. 18 S.W.3d 877, 896 (Tex. App.—Dallas 2000, pet. denied). There, the allegedly defamatory statements were made to the minister's grandparents, as opposed to being internal statements made by the church in connection with its employment decision. *Id*. The court could "not perceive" any ecclesiastic reason for these statements and, therefore, resolved that portion of the claim in Turner's favor. *Id*. at 896, 898; *see also Tran v. Fiorenza*, 934 S.W.2d 740, 744 n.2 (Tex. App.—Houston [1st Dist.] 1996, no pet.) (anticipating that minister's defamation claims against church may be subject to review if statements "overstep the bounds of the authority's administrative duties" and "are clearly intended to defame or inflict emotional distress").[9]

Here, because the statements contained in the chairwoman's letter and made in response to the congregation members' questions were outside the bounds of the Church's employment decision, they do not appear to be of an ecclesiastic nature, and therefore should not have been dismissed for lack of subject matter jurisdiction. Nonetheless, as in *Drevlow*, we cannot

---

[9] Although *Turner* was decided in the context of a summary judgment rather than a motion to dismiss, we find it persuasive because the essential issue was the same as here: whether, when considering the evidence in favor of the plaintiff as true, the plaintiff's claims are nonetheless barred as a matter of law based on a lack of subject matter jurisdiction. *See* 18 S.W.3d at 885-86, 898. Furthermore, *Turner's* holding relied on *Drevlow*, which (like the instant case) was based on a motion to dismiss. *See id.* at 896 (citing *Drevlow v. Lutheran Church*, 991 F.2d 468, 471-72 (8th Cir. 1993)).

predict the evidence that will be presented on the merits and, thus, we caution the trial court to abstain from a review of ecclesiastical issues. *See* 991 F.2d at 471-72. As the court aptly stated in *Smith v. Raleigh District of North Carolina Conference of the United Methodist Church*,

> If it appears during the course of this litigation that a doctrinal issue must be addressed to resolve plaintiffs' complaint, the court would not be precluded from revisiting this issue. For purposes of this motion to dismiss, however, there is no forecast of evidence suggesting that such an issue will arise.

63 F. Supp. 2d 694, 715 n.16 (E.D.N.C. 1999). Also, we note that we are not deciding the merits of whether or not these statements were defamatory. That will be for the fact-finder to determine on remand. Our holding is limited to the issue of whether or not, on the record before us, the trial court had subject matter jurisdiction to review Patton's claims.

## CONCLUSION

The trial court properly dismissed Patton's claims that were based on the Church's decision to terminate Patton from his position as Director of Youth Ministries because this was a "ministerial" role and the Free Exercise Clause of the First Amendment prohibits secular review of a church's employment decisions about its ministers. *See Rayburn*, 772 F.2d at 1169.

Accordingly, we affirm the portion of the order that dismissed Patton's claims for tortious interference with an employment contract and for defamation as it related to the Church's employment decision. However, we reverse and remand the portion of the order that dismissed Patton's defamation claims, to the extent they were based on statements made to members of the

16

congregation outside of the employment decision, to provide Patton an opportunity to prove the merits of these claims.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed in Part; Reversed and Remanded in Part

Filed:  May 11, 2006